In re the ADOPTION OF C.M., a/k/a C.J.M., a Male Minor Child born 10–17–06, S.M. and M.M., Respondents,

v.

E.M.B.R., Appellant.

No. SD 32228.

Missouri Court of Appeals, Southern District, Division One.

Oct. 7, 2013.

Motion for Rehearing and/or Transfer to the Supreme Court Denied Oct. 29, 2013.

Application for Transfer Denied Dec. 24, 2013.

R. Omar Riojas and Christopher M. Huck, of Seattle, WA, for Appellant.

Joseph L. Hensley, of Joplin, MO, and Richard L. Schnake, of Springfield, MO, for Respondents.

Belinda K. Elliston, of Webb City, MO, for Juvenile Office.

Linda K. Thomas, of Springfield, MO, for Child.

Anthoney E. Rothert, of St. Louis, MO and Jennifer Nagda, of Chicago, IL, for Amici Curiae the Young Center for Immigrant Children's Rights at the University of Chicago.

Robert P. Berry, of St. Louis, MO, for Amici Curiae the National Immigrant Women's Advocacy Project, et al.

Marie Kenyon, of St. Louis, MO, for Amici Curiae Catholic Legal Assistance Ministry.

WILLIAM W. FRANCIS, JR., J.

E.M.B.R. ("Mother"),[1] appeals from a judgment entered by the Juvenile Division of the Circuit Court of Jasper County ("trial court") on July 18, 2012, terminating her parental rights, and a judgment entered on July 30, 2012, granting a petition for adoption of her son, CM. ("Child"),[2] by S.M. and M.M., (collectively "Adoptive Parents").

William J. Fleischaker, of Joplin, MO; Curtis E. Woods, of Kansas City, MO; and

### Motions Filed by Adoptive Parents

We begin our examination of this appeal with a "Motion to Dismiss for Violation of Briefing Rules" filed by Adoptive Parents.[3]

---

1. Mother used numerous aliases: A.A., A.A.R., A.E.R., and R.L., as well as used her second name "Maria," and the nickname "Chona."

2. When this case commenced, Child was eleven months old; Child will soon be seven years old.

3. Adoptive Parents also argue this appeal must be dismissed because this Court has no jurisdiction. *See* Adoptive Parents' "Motion to Dismiss for Lack of Appellate Jurisdiction." Adoptive Parents argue that Mother's "Notice of Appeal" was untimely as to the July 18, 2012 Judgment terminating parental rights, and was ineffective as to the July 30, 2012

Adoptive Parents argue that Mother's opening brief fails to comply with the requirements of Rule 84.04(c)[4] for a proper statement of facts. The statement of facts submitted in Mother's brief tracks the procedural history of this case through *In re Adoption of C.M.B.R.*, 332 S.W.3d 793 (Mo. banc 2011), and the trial court's "Findings of Fact, Conclusions of Law, and Judgment and Order Terminating Parental Rights" ("Judgment") following a re-trial of this matter after the remand. Mother's statement of facts refers to the findings of fact and conclusions submitted by the trial court, but gives virtually no information as to the evidence before the trial court.

■ The purpose of Rule 84.04(c) is to "define the scope of the controversy and afford the appellate court an immediate, accurate, complete, and unbiased understanding of the facts of the case." *Thompson v. Flagstar Bank, FSB*, 299 S.W.3d 311, 314 (Mo.App.S.D.2009) (internal quotation and citation omitted). It is not the function of this Court to develop the facts and thereby do the work of an advocate on appeal. *See Donnell v. Vigus Quarries, Inc.*, 489 S.W.2d 223, 225 (Mo.App.ST.L.D. 1972). Here, Mother's statement of facts is not a "fair and concise statement of the facts relevant to the questions presented for determination without argument." Rule 84.04(c). Mother's statement of facts also fails to identify evidence favorable to the Judgment. Not only is this a violation of Rule 84.04, but it completely fails to give "an immediate, accurate, and complete and unbiased understanding of the facts of the case." *McCullough v. McCullough*, 195 S.W.3d 440, 442 (Mo.App.S.D.2006).

■ The points relied on section of Mother's brief is also deficient in that some points contain multiple points of error, are multifarious, and in certain cases, fail to state the legal reasons for a claim of reversible error. While it is within our authority to dismiss this appeal for these violations of briefing requirements, given the unusual nature of this case, and its history, we are reluctant to do so because Adoptive Parents' brief does address the points directly, and supplies this Court with a sufficient statement of facts to understand what happened in the underlying court, so we choose to review this case *ex gratia*, *In re C.A.M.*, 282 S.W.3d 398, 405 n. 5 (Mo.App.S.D.2009), as opposed to a dismissal. Therefore, Adoptive Parents' Motion to Dismiss for Violation of Briefing Rules is denied.

## Procedural Background[5]

This appeal comes before this Court after the Supreme Court of Missouri ordered a new trial on all issues within the petition for adoption, as set forth in *C.M.B.R.*

On June 29, 2011, Adoptive Parents filed their "First Amended Petition for Adop-

---

Judgment, granting the adoption. The Supreme Court of Missouri found that the time for filing a notice of appeal in these cases is a *procedural* matter and Rules 81.04 and 81.05 supersede "[a]ny part of [section] 211.261 which might be inconsistent with those rules[.]" *In the Interest of D.J.B.*, 704 S.W.2d 217 (Mo. banc 1986). "The time within which an appeal may be taken does not impinge on the right of appeal, but on the mode by which the right is secured, and hence is a competent subject of rule-making under the constitutional grant." *Crist v. Div. of Family*

*Services*, 775 S.W.2d 266, 267 (Mo.App.W.D. 1989). Under the holdings in *D.J.B.* and *Crist*, Adoptive Parents' Motion to Dismiss for Lack of Appellant Jurisdiction is denied.

4. All rule references are to Missouri Court Rules (2013), and all references to statutes are to RSMo 2000, unless otherwise indicated.

5. We will refer to additional facts in the Analysis portion as necessary.

tion" ("Amended Petition"). Count I of the Amended Petition pled termination of Mother's parental rights pursuant to section 453.040(7), alleging Mother's consent was not necessary because Mother had willfully abandoned Child at least sixty days prior to the filing of the Amended Petition. Count II pled termination of parental rights under section 211.447 [6] due to Mother's alleged abandonment of Child, abuse or neglect of Child, and because Mother is unfit to be a party to the parent-child relationship. The Amended Petition also alleged termination of Mother's parental rights was in Child's best interest. Count III prayed the trial court grant Adoptive Parents' request to adopt Child. Discovery was commenced between the parties and evaluations were done of Mother, Adoptive Parents, and Child.

A new trial was held on February 28, 2012. Mother appeared in person with her four attorneys, one of which was Spanish speaking; an interpreter; and a consular representative of Guatemala. Adoptive Parents appeared in person and with counsel. Also present was the guardian ad litem ("GAL") for Child, and counsel for the Jasper County Juvenile Office. By March 2, 2012, twelve witnesses had been presented but the parties had not presented all of their evidence. As a result, trial resumed on April 9, 2012, and concluded on April 13, 2012. In total, twenty witnesses testified, with approximately 1,750 pages of transcript, and over 160 exhibits were admitted into evidence. At the conclusion of the trial, the trial court invited the parties to submit proposed suggestions, findings, and orders. The trial court also ordered a transcript be prepared so the parties and the trial court would have it available. Mother filed a "Post–Trial Sur–Reply Brief," a "Post–Trial Opening Brief," and a "Post–Trial Reply Brief."

The trial court entered its Judgment on July 18, 2012.

## Factual Background

■■■ We would be remiss not to emphasize that we relate the facts as we *must* view them under our standard of review. "We defer to the fact-findings of the juvenile court and consider all evidence and reasonable inferences in the light most favorable to the judgment." *In re N.J.S.,* 276 S.W.3d 397, 400 (Mo.App.E.D.2009). In fact, "[g]reater deference is granted to a trial court's determinations in custody and adoption proceedings than in other cases." *S.L.N. v. D.L.N.,* 167 S.W.3d 736, 741 (Mo.App.W.D.2005). When the evidence includes two reasonable but different inferences, this Court is "obligated to defer to the trial court's assessment of the evidence." *C.M.B.R.,* 332 S.W.3d at 815. "Accordingly, we are not free to credit evidence or inferences that favor the terminated parent. To the contrary, we must ignore these." *In re J.A.R.,* —— S.W.3d ——, ——, 2013 WL 4432355, at *1 (Mo. App.S.D. Aug. 20, 2013).

■■■ Further, "we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony." *In re B.C.K.,* 103 S.W.3d 319, 322 (Mo.App.S.D.2003). Thus, we cannot ignore the trial court's express finding, after "ample opportunity to weigh the credibility of the testimony of each witness," that the testimony of Mother and her family members was "riddled with inconsistencies, nonsensical explanations, and outright lies."

Constrained by the foregoing, we offer a detailed timeline of events to explain the bases for the trial court's decision and for ours.

---

**6.** References to section 211.447 are to RSMo Cum.Supp. (2007).

Mother is from a rural village in Guatemala. One of her brothers, Bartolome, and a sister, Maria,[7] are undocumented immigrants living with their "spouses" and children in Carthage. Another brother, Jose, has lived off and on in Carthage working, and then returning to his family in Guatemala. Mother went through the second grade and speaks Spanish, but stated she could not read or write Spanish very well. At the time of trial, seven years after coming to the U.S., Mother stated she could not speak, read, or write English.

Mother has illegally entered the U.S. on at least two occasions. The first time occurred in June 2005, when she was smuggled across the border by a "coyote." Mother was caught, detained for approximately a month, and then deported to Guatemala. She remained there for a short time and then re-entered the U.S. in the fall of 2005. This re-entry was also through the means of a "coyote," paid for by Maria—approximately $4,000. Mother testified that in coming to the U.S. the second time, she was required to walk through the mountains and the desert for a total of 14 hours, over two days. She was then picked up in Houston, Texas, by a friend of Maria's and driven to Carthage.[8]

Mother testified she met Child's biological father[9] while working at George's and became pregnant with Child. At some point, the biological father was arrested by Immigration officials and deported. Mother also has two other children. These children reside in Guatemala with two of Mother's sisters. The oldest is a boy, born May 3, 1997; the youngest is a girl,[10] born December 21, 2003.[11]

Mother has not seen either child for approximately seven years. Mother stated she had no "plans to see [my] children," that if "God allows me to stay here, I'll stay," and that she would prefer to be here, even though her children want to see her. If she is involuntarily deported from the U.S., Mother does not plan to reside

---

**7.** In the record, Mother's sister, Maria, is also referred to as M.B., M.B.R., or M.E.D.

**8.** The date of this second return has been highly disputed by Mother even though there is a surplus of evidence and documentation to indicate otherwise. Mother filled out an employment application for George's Poultry Processing plant ("George's") in Monett dated November 23, 2005. In a plea agreement in federal court, Mother stated her second illegal entry into the U.S. was on May 10, 2006, by way of Hidalgo, Texas. In two separate filings by Mother with the U.S. Department of Homeland Security ("Homeland Security")—Department of Immigration and Customs Enforcement ("Immigration"), one being her application for stay of deportation, Mother claimed another date for her second re-entry by stating she illegally re-entered on January 1, 2006, at Nogales, Arizona.

**9.** The biological father's rights were previously terminated and he is not a party to this appeal.

**10.** Sometime in 2009, Mother's daughter in Guatemala began having behavioral problems. Although Mother believed daughter's problems stemmed from Mother being sent to jail, evidence suggested it was not until sometime in early 2009 that these problems manifested themselves. By this time, Mother had not seen her daughter since coming back to the U.S. the second time. Mother's daughter began psychological treatment in Guatemala in November 2010, and it was paid for by the Guatemalan embassy. Mother testified she did not have direct contact with daughter's psychologist, but merely spoke to her sister about daughter's treatment.

**11.** At trial, Mother did not remember how old her two children in Guatemala were:

Q. And how old is [B.A.S.]?
A. I don't know whether he's 14 or 15.
. . . .
Q: And how old is [W.N.B.]?
A: I don't remember. I don't know whether she just turned nine or ten[.]"

with her children in Guatemala without Child. Instead, Mother indicated she will attempt to smuggle the children, along with herself, back into the U.S. despite the fact she may be caught, arrested, imprisoned, or even killed in the process.

Upon her arrival in the U.S., Mother first resided with Bartolome, his "wife," and their three children. Due to Bartolome's undocumented status, he too was subject to deportation.[12]

Mother began working at George's sometime after November 23, 2005. By January 1, 2006, she was living at an unknown address in Monett, which was about the same time Mother went to live with Child's biological father.[13]

In May 2006, Mother was again living with Bartolome, with the agreement she would baby sit Bartolome's three kids in exchange for living there. While living there, Mother met Laura Davenport ("Davenport"), a Parents as Teachers ("PAT") educator who spoke Spanish, and happened to be visiting Bartolome's children.

On July 18, 2006, Mother completed a walk-in appointment at the Women, Infants, Children ("WIC") office, which was considered a prenatal visit and was necessary to obtain food stamps. Mother received three food vouchers, which allowed her to receive five gallons of milk and a pound of cheese. Mother's next scheduled appointment at WIC was September 19, 2006, but Mother did not keep that appointment.

As of September 26, 2006, Mother was living with her brother Jose, and another man in a one-room apartment in Carthage, where she slept on the floor in the same room as the two men. On September 27, 2006, shortly before Child was born, Mother had her first official visit with Davenport at Jose's apartment. Davenport described inadequate living conditions in that apartment. At this visit, Mother told Davenport she had been keeping her prenatal visits, but could not tell Davenport her doctor's name or where the clinic was located. Mother presented no evidence at trial of prenatal visits other than to say she did receive prenatal care.

On October 17, 2006, Child was born in Joplin as a full-term child.[14] On October 19, 2006, hospital records show Child was brought from the nursery to Mother to nurse. However, Mother was missing from her room. Later, the hospital determined Mother had left the hospital without notifying staff and without making any provisions for Child.

On October 20, 2006, Mother still had not returned to the hospital for Child, or contacted the hospital. The hospital was unable to locate Mother because she had given the hospital two wrong addresses,

---

12. Sometime thereafter, Bartolome was deported after he was picked up for drunk driving. He subsequently returned to the U.S.

13. Mother lived with father approximately four months, but he became abusive to Mother. The police were called and father was arrested and subsequently deported. Mother did not seek medical treatment for any injuries caused by father to herself or possibly her unborn child, even though she testified she had "extensive bruising," nor did Mother appear at father's court appearance. Mother stated father threatened upon his deportation that if Mother ever came back to Guatemala, he would kill her.

14. There was some confusion on Child's birth certificate since Mother stated she was 30 years of age at the time of Child's birth. However, in the plea agreement in federal court, Mother stated she was born March 26, 1975. Identification papers in the Juvenile Court's file state she was born March 26, 1976. Despite the difference in birthdates on these documents, Mother is the biological mother of Child.

and a non-working phone number. Not knowing what to do with Child, hospital staff notified social services. Eventually, Mother was located by social services and agreed to return to the hospital to pick up Child. However, even then she arrived an hour late with no explanation as to why she left the hospital, or where she went during those first days of Child's life.

While at the hospital, Child received his initial immunizations given to children at birth. On October 24, 2006, Child was seen for a follow-up exam by pediatrician, Dr. Denise Hamar ("Dr. Hamar"), and no problems were identified. Child was to be seen again on October 31, 2006, but Mother did not keep that appointment.

On October 25, 2006, Davenport once again paid a visit to Mother at Jose's apartment. Davenport observed there was no place for Child to sleep and he was sleeping with Mother on a pallet on the floor while Jose and the other man shared a mattress, all in the same room. Davenport returned a few days later with a crib so that Child would not have to sleep on the floor. Mother had not obtained a crib even though cribs were available to her from various sources, free of charge.

On November 7, 2006, Mother had her first post-natal visit at the WIC office in Joplin, and was given vouchers allowing her to receive eight cans of formula, with one can lasting approximately five days.

Davenport's next visit with Mother was on November 15, 2006. At this visit, Davenport noticed Child seemed weak and she instructed Mother on exercises she could do with Child to improve his strength. Davenport also attempted to educate Mother regarding services available to her. Sometime after this visit, Mother moved to an unknown location and Davenport could not locate Mother or Child.

On November 27, 2006, Mother returned to the WIC office in Joplin. This appointment had been scheduled to re-certify Mother and Child, but Mother failed to bring proof of income and residence. Mother did receive one food voucher for herself, and was to return in December with proof of income and residency, but she did not keep that appointment. If Mother had kept that appointment, she would have received two vouchers for formula, and would also have been eligible to go to the WIC office in Carthage for her next appointment. The WIC office in Carthage was open three Thursdays a month and was easily accessible by Mother.

On December 19, 2006, Child was seen by Dr. Hamar with complaints of a running nose and cough. Child was diagnosed with a mild upper respiratory infection and "baby bottle tooth decay syndrome." Child also received some additional immunizations. Child was to return for a wellness visit on February 20, 2007, but Mother did not keep that appointment.

Sometime after Child was born, Mother went to work for a "plate company" in Joplin making $15 per day. She worked from 11:00 p.m. to 7:00 a.m. She got a ride with a co-worker, but only worked there a short time. In approximately January 2007, Mother returned to work at George's making $7.50 per hour for 40 hours. She shared a ride with a co-worker and paid $30 per week for the ride.

Also in January 2007, Mother returned to the Joplin WIC office with proof of income and residency, and received a food voucher for herself. Mother was to return to WIC on March 6, 2007, to receive vouchers for formula for Child; however, Mother did not keep this appointment and made no further appointments at WIC.

Child was seen by Dr. Hamar again on March 5, 2007, for a rash on his cheeks and face. The records indicate Child was

scratching to the extent he was drawing blood. The exam showed "scabbing/oozing yellow crusts, red/scaling on both cheeks." Child was diagnosed with "atopic dermatitis" and given a cream and a prescription.

In April 2007, Davenport paid a visit to Bartolome's home regarding his three children, and discovered Mother and Child were again living there. As a result, Davenport had an opportunity to interact with Child once again, who was now approximately five months old. Davenport observed the living conditions in Bartolome's home were also inadequate. Davenport observed Child in his crib drinking from a propped-up bottle. Davenport stated Child was not getting proper nutrition as he was being fed whole milk instead of formula; had not received all of his immunizations; and was developmentally delayed for his age—he was slow to sit up and crawl. Child also had trouble supporting his head and had poor muscle development.

On May 22, 2007, Mother was arrested when Immigration officials raided George's. Mother was arrested under the name of "A.A.R.," because that was the name Mother was using the first time she came to the U.S. and was subsequently deported. Mother gave a sworn statement to Homeland Security stating she was working at George's under an assumed name, "R.L.,"[15] and had a social security card and an I–9 form in that name, as well as other papers she had bought in the U.S. from an American for $1,000.

The next day, Mother appeared for arraignment in federal court and did not mention Child. Mother was booked into the St. Clair County Jail in Osceola the same day under the name of A.A.R., and an alias of A.E.R., which made it difficult

for Mother to receive mail and phone calls. A form was available to Mother, which would have allowed her to correct her name to her legal name of "E.M.B.R." This would have eliminated the problem of getting communications through to Mother while she was in jail. Mother did not fill out the form; however, even though she had cellmates help her fill out other forms. Instead, Mother continued to use her aliases and told family members and visitors to do the same.

Sometime thereafter, Mother was appointed a federal public defender. The public defender testified Mother mentioned Child to her several times and that Child was with her sister. The public defender stated she told Mother several times that she could not assist Mother with any legal issues involving Child, and urged her to retain an attorney who specialized in that area. The public defender also advised Wayne Walter ("Walter"), a friend of Mother's who had called on Mother's behalf, of the need for Mother to retain an attorney for any legal issues involving Child.

When she was arrested, Mother did not advise officials she had a child. Instead, Mother called a friend, Glendi, and asked her to contact Maria to pick up Child at the babysitter. Child spent that night with Maria and her husband, Geronomo, and their two children—a 3–year–old daughter and a son a month or two older than Child.

Maria took Child back to Bartolome's home after one night and discussed with him arrangements for caring for Child while Mother was incarcerated. Maria and Bartolome agreed they would rotate

**15.** R.L. was in fact a real person whose purse, and later identity, had been stolen in San Antonio, Texas.

each week taking care of Child starting with Bartolome.

After the first week, Bartolome took Child to Maria and told her he would be unable to care for Child. By the end of May 2007, Child was living fulltime with Maria and Geronomo in their one-bedroom apartment in Carthage. Maria stated that when Child came to her, Child had diarrhea and a rash on his face, arms, and bottom.

While in jail, Mother was able to make unlimited phone calls from a phone in the common area near her cell, which was available throughout the day and evening until the inmates retired to their cells for the night.[16] The phone was available to the inmates every day except during prisoner transfers. Mother could make calls from jail by either calling collect or by the use of phone cards. All calls were recorded by the jail.

On May 25, 2007, Mother placed her first phone call to Maria. From this first phone call, to the last one Mother made from jail on June 21, 2008, it is clear Mother and Maria intentionally misrepresented and conspired to mislead authorities.[17] In this first phone call, Mother told Maria she had told "them" that Child was with a "friend" and that she had no relatives and no one to leave Child with. Maria told Mother to tell "them" that Child was ill and there was no one to take care of him and to say "that you can only leave your baby with an American woman. Say that."

Although Mother made approximately forty calls to Maria from jail, Mother made little inquiry about Child and did not ask to speak to him. Mother only asked about Child's well-being during two of the forty phone calls.[18]

Maria and Geronomo often told Mother she needed to figure out what to do with Child. For instance, on May 29, 2007, Mother called Maria and spoke with Geronomo (identified in the exhibit as "IGD") who immediately asked Mother:

> [Geronomo] Why don't you ask for your son? ... What do you think you are going to do with the boy? ... If they free you that's fine but the boy is the problem. You see we won't be able to get a social security or birth certificate. Talk to the judge and tell him you want to have your boy.

Geronomo also told Mother to tell the judge that Mother could not return to Guatemala because Child did not have a social security card and birth certificate and that she was "not giving him Enfamil milk. My boy is sick, tell him." Geronomo's final instruction to Mother was to call them back on the 4th so that they knew "what we are going to do with the boy[.]" In another phone conversation, Maria told Mother if she did not get Child a passport so he could be sent to Guatemala, Mother would find herself in Guatemala and Child would be here and "then what would happen with the boy, all alone here, ... [h]e would be given away here."

16. Transcripts of phone calls made to and from Mother were requested from the St. Clair County Jail only for certain phone numbers. Typed transcripts of various phone calls were entered in evidence at trial.

17. Mother also misled the Guatemalan consulate. On June 3, 2007, Mother placed a phone call and advised Geronomo that she had spoken with the Guatemalan consulate and because she had not signed her deportation papers, that they would help her. Mother stated, "They asked me for a phone number and I told them I didn't have any relatives."

18. These two phone calls were on June 27, 2007 and July 13, 2007.

On June 8, 2007, Davenport visited Maria's home to see her two children and unexpectedly encountered Child. She was not aware Mother had been arrested and that Child had begun living with Maria and her family. As with her prior encounters with Child, Davenport was concerned with the care Child was receiving. He was still not receiving proper nutrition, and was still developmentally delayed. Maria admitted she was not feeding formula to Child as there was not enough formula for her son and Child, so she was giving Child whole milk. Maria also expressed her concern in caring for Child. She was upset with the new responsibility of caring for Child in addition to her other two young children; the extra cost involved; trying to transport three children in her vehicle; and the general "mechanics of it." Davenport left Maria's home and went to the PAT office where she collected as much formula as she could. Davenport even stopped on the way back to Maria's to purchase more formula for Child with her own money.

It was clear from the phone calls, as well as actions and observations of others, that Maria and Geronomo were not interested in caring for Child. On May 28, 2007, Maria complained to Mother, "Your baby sure cries a lot. . . . Just like always he has cried a lot." During this same time, Davenport was contacted by the babysitter for Child, who expressed her concern that Child was not being treated fairly. She indicated that clothing and formula given for Child's use were instead being given to Maria's son, and that Child was being left to sit in a car seat all the time.

On June 11, 2007, due to her concerns about Child's well-being, Davenport contacted Jennifer Velazco ("Jennifer") and Oswaldo Velazco ("Oswaldo") (collectively the "Velazcos"), to see if they would be willing to assist in the care of Child. Davenport was familiar with the Velazcos and was aware they had assisted with childcare for another mother who had gone to prison for being in the U.S. illegally. The Velazcos agreed to meet Child.

On approximately June 13, 2007, the Velazcos went to the home of Maria and Geronomo to meet Child. Child was now approximately eight months old and Jennifer noticed Child could not hold up his head. The Velazcos offered to watch Child during the day, free of charge, which Maria and Geronomo accepted. Initially, the plan was for the Velazcos to provide daytime childcare only. Under the plan, Jennifer was to pick Child up in the morning at Maria's home. After work, Maria would then go to the Velazcos' home and pick up Child.

This arrangement began approximately June 15, 2007. From the onset there were problems. On the first day that Jennifer attempted to pick up Child at Maria's home, no one answered the door. Maria had already left to take her own children to daycare. When Maria arrived back home, Child was not with her. Jennifer realized Maria had left Child alone in her home.

Maria gave Jennifer some diapers and only one can of formula, and told Jennifer that they could not afford more formula especially since Child was not theirs. It became apparent Child had not been receiving proper care and nutrition from Maria and Geronomo, and that little care or attention had been given to Child.[19] Instead, Child was left to languish in a car seat in Maria's home, and had developed a

---

**19.** There was no evidence that Maria's son, slightly older than Child, was malnourished or developmentally delayed like Child.

flat spot on the back of his head. Child was also in a semi-newborn state in that he could not lift his head and did not have proper muscle tone and control for a child his age.

When Jennifer attempted to feed Child formula, he would not drink it. She had to mix formula with whole milk until Child got used to the formula. Child still had a severe rash on his face and arms to the point it was bleeding.[20] He was weak and lethargic, but within a short time of being with the Velazcos, Child began teething, crawling, pulling up, and saying words.

In the meantime, Mother appeared at the federal detention hearing on June 4, 2007, and made no mention of Child. On June 20, 2007,[21] Mother was indicted and charged with four counts of entering the U.S. a second time illegally, falsely representing herself to be a citizen of the U.S., falsely claiming to be a U.S. citizen in order to gain employment, possessing identification of another person, and using a false social security card. Again, Mother made no mention of Child.

Maria and Geronomo repeatedly urged Mother to sign her deportation papers and get her son so they both could return to Guatemala. In response, Mother often said she was waiting to speak with immigration, mentioned she would "probably win because . . . they didn't ask [her] that

many questions," and she had heard of other individuals who had won their case. Mother did not sign the deportation papers.

On June 27, 2007, Mother spoke with Geronomo and he advised her that someone would be coming to see her in order to bring the paperwork necessary to obtain a social security number and birth certificate for Child.[22] Later that same day, Mother made a second call to Maria during which she told Maria that "even if something happens to me they can't take me because I am going to say that I am a single mom." Mother also asked the name of the person coming to see her, and Maria told Mother to put her down as the person coming to visit. Mother then handed the phone to a cellmate[23] who explained the "visitor" procedure and asked Maria for her phone number—Maria denied having a phone number. Mother made yet a third call to Maria that day during which Mother's cellmate told Maria she had to bring ID. or she would not be allowed in the jail, and "[t]hey can keep [you]." Mother then told Maria not to come to visit "because you don't have good papers" and Mother did not want Maria to be jailed with her. Maria agreed she would not come, but someone else would.

Sometime between June 16, 2007 and July 1, 2007,[24] the arrangement where the

20. Phone calls between Mother and her family indicated they knew Child was sick in late May 2007. In a phone conversation, Maria told Mother Child was progressing now because "[t]he milk was what he was lacking because you, you only gave him milk out of the gallon."

21. On this same day, Davenport visited the home of the Velazcos to conduct some rudimentary testing on Child and found that he could not yet sit up or imitate speech.

22. Mother was required to fill out a form prior to any inmate visit. Mother had several

visitors and for each one, she either filled out the form herself, or was able to find someone to assist her.

23. One of Mother's cellmates was bilingual in Spanish and English. Mother often used her to translate not only in phone conversations, but also with reading and writing letters and other legal documents Mother received while in jail.

24. These dates were heavily disputed by Maria and Geronomo, but the trial court did not find their testimony to be credible and found

Velazcos watched Child during the day changed because Maria and Geronomo were finding it inconvenient to pick up Child in the afternoons. Maria was also finding it difficult in the mornings to take her own children to the babysitter, get back in time to meet Jennifer, and then to catch her ride to work. The Velazcos agreed they would watch Child from Sunday night or Monday morning through Friday night, and then Maria and Geronomo would watch Child on the weekends. However, even with those concessions, Maria and Geronomo still found it inconvenient to have Child with them; they complied with this new schedule for only a few weeks.

On approximately July 7, 2007, the Velazcos became a full-time placement for Child. Maria did not come to see Child at the Velazcos' home, a fact she related to Mother in a phone call. While Geronomo visited only occasionally, after several weeks, his visits stopped all together. Maria and Geronomo provided no further support, formula, or diapers for Child and, in fact, Jennifer purchased most of Child's clothing at garage sales where she would run into Maria buying clothes for her own children. Jennifer also secured a birth certificate for Child.

In spite of Mother's denial, the recorded and transcribed phone calls between Mother and Maria confirmed Mother was aware the Velazcos were watching Child as early as July 13, 2007. On that day, Mother called Maria to let her know she had been sentenced to two years and had not spoken to Immigration yet. During this call, Maria advised Mother that Child was now with a "gabacha" or "foreigner," [25] and that Maria was only taking care of Child "two days." Mother expressed her confusion and asked, "He is not with what's their name then?" Maria advised Mother that "[t]hey didn't want to take care of [Child]" as it was "time-consuming."

During this call, Maria advised Mother that the "foreigner" was introduced to her by Davenport and was not charging for that care. Maria also informed Mother that Child now "drinks straight formula. He isn't drinking milk out of the gallon any more" and "[h]e stands up now." Maria advised Mother that the foreigner's name was Jennifer and she was going to give Mother Jennifer's phone number. Maria told Mother to ask Immigration to get Child from Jennifer and then deport both of them. Child already had a birth certificate and social security number and just lacked a passport, which Maria told Mother Immigration could secure. Mother's only response was, "But I will probably win because it turns out that they didn't ask me that many questions.... I will probably win my case here."

Mother confirmed she knew the Velazcos were taking care of Child again in her phone conversation with Geronomo on August 18, 2007. During this call, Mother asked for Jennifer's phone number again. Geronomo told Mother, "Sorry, [h]e's already been given away. He's been given away already." Mother responded that "[y]ou already told me already." [26] On

the testimony of the Velazcos to be credible on this issue.

**25.** There was some discrepancy in testimony as to the meaning of the term "gabacha." The translator testified at trial it was her opinion that "gabacha" was a "negative term referring to a female white woman ... possibly the equivalent of 'cracker.'" Maria and

Mother both testified that it merely meant Child was with an "American" or "white lady."

**26.** Mother asked for the Velazcos' phone number again on August 20, 2007, because she alleged the number was taken when her room was "rummaged." Mother asked for their number this time because Immigration

August 20, 2007, Maria again told Mother she was no longer taking care of Child and, "[t]he boy drank a lot of milk and I got tired of taking care of this child."

Mother was given the Velazcos' phone number shortly thereafter. However, the Velazcos received no communication from Mother while caring for Child, although Mother was aware they were caring for Child.[27]

Mother again acknowledged she was aware Child was not with Maria during a phone call on September 11, 2007. During this call, Mother inquired whether "what's her name ... [w]here my child is" was going to send pictures of Child.

Mother's knowledge of Child's whereabouts was also evident on September 19, 2007, when Davenport visited Mother in jail.[28] During their discussion, Davenport mentioned the Velazcos at least ten times, and Mother mentioned them at least twice.

Mother admitted to Davenport that she did not leave Child in good hands or shape and that she did not give Child formula, which left him in a weak and frail condition. Mother admitted Child was now in good hands with the Velazcos and but for them, Child would not have turned out okay.[29] Mother also asked Davenport if she had brought pictures of Child, and Davenport indicated that Jennifer had not had time to put any together.[30]

Mother made many calls to Maria from jail, but expressed little interest in the welfare of Child.[31] Mother did not ask about Child, attempt to contact him, or send any gifts, including for his first birthday in October 2007. Mother was also able to send letters from jail. The jail provided stationary and postage for up to three letters per week, free of charge. Mother did not send Child any letters.

In September 2007, Adoptive Parents were contacted by a family member as to

asked for the phone number of where her son was located. At that point Mother, "only wanted [the phone number] to give it to the lawyer and to [I]mmigration because on the twenty-eighth [she had] an interview with [I]immigration." Since Mother told her lawyer Child was with a friend, they wanted to talk to the friend.

27. Although Mother later denied any knowledge that the Velazcos were caring for Child, the trial court did not find her denials on that issue credible.

28. The visit was taped by jail authorities and was later translated and entered in evidence. The translator appeared as a witness at trial and was cross-examined extensively over two days. The trial court also allowed the actual taped conversation to be played and changes made to the translation. The parties agreed on the record to the changes.

29. Mother told Davenport that if deported with Child, when Child was older, somehow she was going to return to the U.S. with Child so he could work here and that since her other two children were born in Guatemala,

they would have *"to find a way to make out over there."* (Emphasis added).

30. Mother alleged Davenport was to bring Child with her to visit Mother. There is no evidence in the record before us that anyone told Mother that Davenport was bringing Child, nor did Mother ask Davenport in their meeting why she had not brought Child.

31. Mother also expressed little concern for her other children during this time. For example, on February 7, 2008, Mother called Maria and asked Maria if she had spoken to their sister in Guatemala and if she knew how her children were doing. Maria told Mother their sister had enrolled them in school because "the mom is not responsible." Mother laughed and commented "[a]nd here, one is in jail[.]" Maria told Mother her daughter went into the first grade because Mother "didn't get the little girl's birth certificate right. You are also stupid. You said that the girl was seven years old ... [t]hat's why she went in to first grade." Mother then referred to something obscure about having an earring "in a tin of milk, there with Carolin[a]" and asked Maria if she had it.

their possible interest in adopting Child. They agreed to meet with the Velazcos and Child.[32] From September 25, 2007 to October 5, 2007, Adoptive Parents visited with Child in the Velazcos' home to become acquainted with Child. By October 5, 2007, Adoptive Parents had an overnight visit with Child. On that same date, Adoptive Parents filed their "Petition for Adoption" ("Petition") seeking termination of parental rights under section 211.447, and adoption without consent under section 453.040(7). By October 7, 2007, Adoptive Parents were caring for Child fulltime and continued to do so through the date of trial.[33]

During this time, the Velazcos had not seen Geronomo for several weeks. On October 8, 2007, Jennifer attempted to call Maria and also sent a letter to Maria and Geronomo in both English and Spanish. In the letter, she informed Maria and Geronomo that Child was now living with Adoptive Parents, the Adoptive Parents had filed for adoption of Child, and the only person who could object to the adoption was Mother. The letter requested no further contact be made with the Velazcos regarding Child. After that date, no one attempted to contact the Velazcos regarding Child.

On October 10, 2007, Maria told Mother about the letter from the Velazcos and read it to Mother over the phone.[34] During this phone conversation, Maria told Mother she had not been staying in touch with the Velazcos and did not know how Child was doing. Despite the letter and Maria's admission, Mother made minimal attempts to make contact with Child or have someone check on his well-being.[35]

On October 11, 2007, a summons was issued to Mother for service of the Petition by certified mail, and also by personal service at the St. Clair County Jail. On this date, Mother also made three phone calls to Davenport (one in the afternoon and two after 6:00 p.m.).[36] The jail phone log indicated the calls were from "A.A." Each time, Davenport's answering machine picked up asking the caller to leave a message—Mother left no messages.

On October 15, 2007, Mother was served the Petition by certified mail. On October 16, 2007, Mother was personally served with the summons and Petition by the St. Clair County Sheriff, and her cellmate, "Belia," read the documents to Mother.[37] The summons was admitted into evidence; it advised Mother she had "the right to

32. Adoptive Parents had participated in a program to teach and license potential foster parents and a home study had also been done at that time.

33. Adoptive Parents were aware that Mother was in jail, but did not know her name. Adoptive Parents did know Maria lived in Carthage. Adoptive Parents' address and phone number were listed in the local phone book.

34. On this same day, Mother attended a change-of-plea hearing and never mentioned Child.

35. The phone log for the St. Clair County Jail indicated Mother attempted to call the Velazcos a couple of times in the afternoon after speaking with Maria on October 10, 2007, but made no further attempts thereafter. While the phone log shows that the collect charges were refused, the administrator of the jail testified that did not mean the Velazcos answered the phone and refused the collect call, rather there simply was no answer.

36. Mother testified she called Davenport eight times, but Davenport testified she recalled getting one call from Mother and did not realize it was Mother due to the name Mother used. Davenport also testified Maria called one time.

37. The return of service of the summons and Petition was filed with the court showing service on Mother.

have an attorney present to assist you at all juvenile court hearings, or you may waive your right to an attorney if you desire to[.]"

Although the Petition was in English, Mother had access to bilingual inmates in jail, the federal public defender's translator, and federal prison officials who could have assisted her in translating the document. Mother also attended church services at the jail, presented by bilingual volunteers. One such volunteer was a Spanish teacher at the local high school. She had assisted Spanish-speaking prisoners with translation in the past, free of charge, and would have been willing to assist Mother. Mother failed to avail herself of these free resources to inquire about the well-being of Child or to contact authorities in connection with the Petition.

In prior proceedings in this Court and the Supreme Court, Mother alleged she was not served with the Petition.[38] The record in this appeal clearly indicates Mother was personally served the Petition, and also received the Petition by certified mail on October 15, 2007. Further evidence she was served is the phone conversation Mother had with Maria that same evening during which Mother stated she received a letter from the government about Child and adoption.

The administrator for the St. Clair County Sheriff's Department also testified that when Mother was transferred from jail to federal prison, her cell was cleaned and the original Petition was discovered by jail officials left in her cell by Mother, along with other materials belonging to her. This document was subsequently admitted into evidence and caused the trial court to call into question the truthfulness of Mother's denials of receipt and her credibility.

At the re-trial of this matter in 2012, Mother testified she now remembered receiving the adoption papers in jail, but since they were in English she could not read them and she did not know they were adoption papers. Mother indicated she asked for help in the jail, but could not find an interpreter, but later stated a cellmate read them to her. Mother and Maria also discussed the adoption papers in several phone calls. Mother initially testified she did not remember being contacted by any attorneys, but later admitted her court-appointed attorney, Aldo Dominguez ("Dominguez"), contacted her five or six times.

The trial court also questioned Mother's credibility in light of her claim she could not speak English.[39] Despite this claim, she inadvertently responded to an inquiry from the trial court before it was interpreted for her in Spanish. Mother also claimed she could not read English. However, while on the witness stand, Mother was observed reading documents in En-

---

**38.** On October 6, 2009, Mother signed a sworn affidavit as to events leading up to Child's adoption which contained many inconsistencies, the most important being that Mother alleged she received no court documents concerning the adoption of Child.

**39.** Mother's family even called into question her credibility. On January 1, 2008, Mother called Maria. Maria was heard to say, "I don't believe what [Mother] says anymore. [Mother] just lies. I'm not even going to listen to her." Maria asked Mother, "Weren't

they going to send you? Those were lies!" Mother indicated it would now be sometime in January 2008.

Again, on April 5, 2008, Mother called Maria. Maria asked Mother why she had not been sent yet, and Mother responded because she had not been sentenced yet. Maria apparently had been talking to local people who had told her otherwise. Maria told a third party, "[Mother] says that she stayed! She doesn't know how to say the truth anymore. No, I don't know who is telling the truth."

glish to herself, and would sometimes answer questions before the interpreter could interpret. Later, Mother admitted she could read and write, although it was apparent her reading and writing skills in Spanish, as well as her English language skills, were somewhat limited.[40] Nonetheless, the trial court found the fact that Mother

> could read and write Spanish, speak English, and had access to translators and bilingual individuals throughout the critical time period is clearly opposite the facts previously submitted by [Mother] in having [C.M.B.R.] overturned on appeal and call[ed] into question her credibility in this matter.

The trial court found "that despite having the means and ability to provide for [Child's] care and well being, however minimal, [Mother] simply chose not to do so." This was true during Mother's incarceration. On October 1, 2007, Mother began receiving money in jail as evidenced by the "St. Clair County Sheriff's Office Bank Report" ("bank report"). All money received and all money spent in the jail's commissary, was recorded in the bank report.

From the time Mother became incarcerated in the St. Clair County Jail until July 10, 2008, when Mother was transferred to federal prison, Mother received money from multiple sources, including her family, church, and friends, and made purchases from the commissary. Mother made purchases from the jail's commissary on January 1, 2008, February 26, 2008, March 4, 2008, March 11, 2008, April 4, 2008, June 12, 2008, June 17, 2008, June 24, 2008, June 30, 2008, July 1, 2008 and July 8, 2008. Her commissary purchases totaled $52.71. Each purchase necessitated filling out a form. Mother either filled the form out herself, or had assistance. Upon transfer to federal prison, Mother had $297.29, but Mother provided no monetary support to Child, Maria, or the Velazcos while incarcerated in the St. Clair County Jail.

Mother also received visitors while incarcerated in St. Clair County. For example, on October 28, 2007, Saul Gutierrez ("Gutierrez"), Walter, and their spouses, visited Mother in jail.

Mother also sent letters to friends and her church asking for money.[41] For example, Mother sent her friend Corina a letter on June 22, 2008, asking her to ask the church for $100 to help Mother pay her fine. She received the requested money. Mother also wrote a letter on September 28, 2008, to Corina, asking whether the church brothers were going to help her with $200. Mother asked if they could give the money to Corina, Corina could then send the money to Mother, and Mother would then send the money to her lawyer. Sometime thereafter, Mother wrote another letter to Corina asking Corina to ask the church brothers to help her out and send her another $25. Mother's next letter to Corina was to inquire if she had sent the money that the "brothers got together" for her.

During her incarceration, Mother also requested her family provide money and items for her. For example, on April 24 and May 2, 2008, she asked Maria to buy

---

40. Although Mother testified she could not write in Spanish, she later acknowledged she could write "a little" when presented two letters she acknowledged were in her handwriting.

41. Mother also sent letters to individuals by way of Maria. She sent a letter to Glendi, in care of Maria, to give to Mother's church wherein Mother was asking the church for money.

her some pajamas, but did not request they purchase any items for Child.

On occasion, Mother's cellmates wrote letters on Mother's behalf. For instance, on November 9, 2007, after receipt of the Petition, Mother sent a letter to Child's GAL, written by a cellmate but signed by Mother, outlining events from her arrest. Mother stated in the letter that she wanted to take Child to Guatemala.

Mother was also appointed counsel on two occasions. On December 3, 2007, Mother was appointed James Calton as her attorney.[42] Dominguez was later appointed as Mother's attorney replacing James Calton.

Despite access to a phone, ability to write letters, individuals providing Mother money at her request, cellmates to translate on her behalf, knowledge of where Child was living, funds to call Child, funds and ability to send support to Child, and constant communication with her family, Mother expressed and/or showed no interest in Child during her incarceration.

As her federal case progressed, Mother discussed making arrangements for her to stay in the U.S. with Maria.[43] For example, on May 24, 2008, Mother called Maria to tell her she had court on July 13 and "supposedly they are leaving me here because ... since I don't have family here[.]" Mother then asked, "[t]hat guy's cousin, he may be able *to give me a phone number* so that in case they let me stay here, right?" (Emphasis added). Maria questioned, "What cousin?" and Mother stated, "It's that, you know how I don't have any phone

number here where I can call if they let me stay here, ya know." Maria stated, "Yes, but ... I need to talk to him if ... if he will want to. Anyways, if you're going to call him he'll have to receive a collect call." Mother said, "[J]ust calling you to let him know and I'll see what day I can call you." Maria replied, "Okay. I'm going to ask and then later you can call." [44]

By January 22, 2008, Mother had four court appearances in her federal criminal case and did not mention Child at all. It was only at her federal sentencing hearing on June 13, 2008, that Mother mentioned Child to the judge. At that time, Mother informed the judge that Child was in "custody of government." Mother was sentenced to two years in prison and upon release, to one year of probation. Mother was to pay the U.S. a $100 special assessment, which was due immediately.

Thereafter, on June 14, 2008, Mother was sentenced in federal court, and she called Maria to tell her she was being deported to Guatemala, but first would be transferred to another jail for seven months. Mother asked Maria, "[W]hat name is on the boy's social security card?" Maria said, "Well, his name! What do you mean, 'What name?'" Mother stated an "American girl" had read to her that "they changed my son's name[,]" and that is why Mother was asking. Maria told Mother that the social security card showed Child's name as C.M.B.R. Mother asked Maria to send her a copy of Child's social security card.

**42.** The court sent notice of the appointment of counsel to Mother at the St. Clair County Jail, but the letter was returned on December 11, 2007, marked "Return to Sender" and "Refused." The letter was addressed to "E.B.R."

**43.** During these phone calls, Mother made no mention of arrangements for the care and well-being of Child.

**44.** On June 7, 2008, Maria gave Mother a phone number for a person named "Wendy de la Pena." Maria indicated she was given the number by Glendi's husband and Mother was to call him "in case you need anything."

On July 10, 2008, Mother was transferred to a federal prison in West Virginia.[45] During Mother's incarceration in West Virginia, Mother did not contact Child or provide for his support, even though she had funds to do so.

Mother was incarcerated during the first termination trial on October 7, 2008, approximately a year after she was served with the Petition. On October 8, 2008, the court filed a judgment terminating Mother's parental rights to Child and granting Adoptive Parents' adoption request of Child.

On February 28, 2009, Mother was released from federal prison on supervised release for one year. Since Maria and Geronomo were undocumented immigrants in the U.S., she could not live with them while on supervised release, so Mother moved in with Corina and her family in Monett. In August 2009, Mother's address was shown to be that of Maria's, where she continued to live as of the date of trial. As part of their living arrangements, Mother paid money to Maria and Geronomo to help support the household.

Although Child was not living with Mother, she claimed him as a dependent on her tax returns for the years 2009, 2010 and 2011.[46] This resulted in Mother receiving tax refunds to which she was not entitled. In 2009, Mother reported $815 in income and received a $368 tax refund; she would have only received a $150 refund without Child as a dependent. In 2010, Mother reported $16,190 in income and received a $5,481 refund; she would only have received a $797 refund without Child as dependent. In 2011, Mother reported income of $21,774 and received a $4,457 refund; she would have only received a $348 refund without Child as a dependent.[47]

Mother was able to work after her release from prison under a stay of deportation.[48] She was granted several work permits and since late 2009, has had continuous employment. Mother worked at Tyson's in Monett, making $9.00 per hour for 40 hours from December 2009 until her work permit expired on July 24, 2010.[49] On September 7, 2010, Mother began working under a new work permit at Tyson's in Noel. In September 2011, Mother began working at Butterball (later ConAgra) in Carthage making $10.77 per hour for 40 hours and worked approximately 13 hours overtime.

45. Mother took with her the $297.29 she had left in her jail bank account.

46. On July 13, 2009, Mother received a six-month work permit, but it expired before she sought employment.

47. After the trial testimony of Mother's tax preparer on February 29, 2012, "new tax returns were prepared" for Mother for the years 2009, 2010, and 2011. Mother was not entitled to a portion of the refund she had received by way of claiming head of household status, claiming Child as a dependent, receiving the "Making Work Pay" credit, and child tax credit. In each instance, Mother had to claim Child lived with her anywhere from six months to a year for the respective tax year. Mother received a total of $9,011 in tax refunds for which she was not entitled. Mother sent $5,000 of this money to her sister in Guatemala; the remainder Mother deposited in a bank account in the U.S. A friend loaned Mother the $5,000 she had deposited in Guatemala to return to the IRS until Mother was able to secure it from her sister.

48. On November 8, 2009, Mother traveled to Washington, D.C., and visited the Guatemalan embassy to ask for a stay of deportation, which she received. The Guatemalan embassy gave her $500 for travel expenses.

49. During her November 14, 2011 deposition, Mother testified when she was not working, she received money from the Guatemalan embassy.

Although working, Mother made no attempt to contact Child[50] or provide support for Child.[51] It was not until July 30, 2010, that Mother requested visitation with Child. At this point, Mother had not seen Child for over three years.

On February 14, 2011, the Supreme Court filed its mandate affirming in part, and reversing in part, and ordering a new trial on all issues within the Petition. *See* *C.M.B.R.*, 332 S.W.3d at 793.

After the Supreme Court's mandate in *C.M.B.R.*, Mother, for the first time, sent support to Child. In April 2011, Mother sent two $20 money orders to the GAL. Again, in June and July 2011, Mother sent $60 more and some handwritten notes to Child. However, after the July payment, the court suspended payments by Mother due to an issue over processing the checks by the circuit clerk. At re-trial, the trial court advised Mother's counsel it would not adversely consider any nonpayment by Mother after the date it suspended payments, but that it would consider the fact she had not made payments in the four years before the startup of payments in 2011.

Prior to the new trial, Mother's deposition was taken on November 14, 2011. Mother testified she only wanted a passport for Child so she could send him to Guatemala to her sister who would take care of him. Mother admitted she was going to try and stay in the U.S. and send money to Guatemala for Child. However, she testified that "if God let's [her] stay here, [she is] going to keep [Child] here," but if she and Child are deported, "[w]hen [C]hild gets 18, he's going to decide to come back here" and she will try and come with him even if it means "[c]oming back illegally."

When questioned about her other children in Guatemala, Mother could not remember their birthdays. She testified she had no plans to see them, and knew her children wanted to see her, but she would rather be in the U.S. She had asked to remain in the U.S., but if she was not returned to Guatemala with Child, she did not want to return.

Maria's deposition was also taken. Maria testified that when she got Child after Mother's arrest, he was sick, had a rash on his face, and diarrhea because Mother was giving him "milk from gallon." Maria was upset at having to watch Child as he was the same age as her youngest son.[52] Mother sent Maria no money to care for Child; instead Maria sent Mother money.

Mother testified at trial, and her testimony regarding her future plans for Child and her other children was inconsistent and contradicted her deposition testimony. She testified that if God allowed her to stay in the U.S., she wanted to be united

**50.** At trial, Mother claimed she did not have an address for Child. However, she sent Adoptive Parents' attorney a letter in September 2008, while she was in prison in West Virginia.

**51.** While claiming she was unable to provide support for Child, Mother was able to appear on a television program in early 2010, in Miami, Florida, to discuss the adoption of Child. Apparently, she was able to see her children in Guatemala through some electronic means, bringing them into the limelight, and this after her daughter was already having psychological problems due to Mother's absence from her life.

**52.** Geronomo's deposition was taken as well. Geronomo also testified Child was sick with a rash, diarrhea, and cried all the time when he came to live with them. Child was drinking milk from the gallon, but Davenport brought them formula. Geronomo said it was difficult for him and his marriage when Child came, so they let the Velazcos have him overnight. He also admitted he told Davenport that Mother "had to be more involved, she had to pay more attention."

with her other children, so she might return to Guatemala and bring them back here, but would bring them back legally. If she was deported, Mother testified she would take Child with her. If deported without Child, Mother testified she would come back as a "wetback." On cross-examination, when questioned about her daughter's emotional problems and possibly returning to Guatemala, Mother responded, "Why should I go, not deported this time." Mother admitted she could go at any time to see her other children, but Child was here and Child was different, "he is American." She stated that if allowed to stay here, she had no plans to see her children in Guatemala. Mother later testified if she was deported without Child, she would try to come back and bring her other children with her illegally.

When questioned by the trial court, Mother admitted that by coming to the U.S. and using a "coyote," she could get killed. Mother stated she would not come back this time through the desert, but on a bus.

Dr. Mark Bradford ("Dr. Bradford") met with Adoptive Parents and Child, conducted various assessments and tests, and testified at trial regarding his findings.[53] Dr. Bradford testified Child demonstrated features of "Reactive Attachment Disorder," which were most likely caused by the separation and multiple placements he endured during the first year of his life. Dr. Bradford testified it would be difficult at this point for Child to bond with Mother, particularly when he does not know her and they do not speak the same language.

Dr. Bradford also testified that a process of reunification with Mother, if it

could occur at all, would take years. He further testified that the first four years of life are critical for attachment and that separating Child from his current placement with Adoptive Parents, whom he considers his parents, and attempting to create a bond with Mother, would be damaging to Child and could negatively affect him for the rest of his life.

Mother's expert, Claudette Antuna ("Antuna"), agreed with Dr. Bradford that reunification could be complicated. However, she testified at trial it was her opinion that reunification between Mother and Child should take place. Mother testified she did not believe there would be any issues with Child if he was reunified with her.

At the conclusion of the trial, the trial court invited the parties to submit proposed suggestions, findings, and orders. On July 18, 2012, the trial court's Judgment was filed. The trial court's Judgment is 61 pages and contains 136 paragraphs of findings of fact. The Judgment ordered the termination of Mother's parental rights to Child, based on the following findings.

## Trial Court's Conclusion for Abandonment and Neglect

The trial court found that the evidence of abandonment and neglect of Child by Mother was clear, cogent, and convincing under both chapters 211 and 453 during the applicable periods preceding the filing of the Amended Petition.[54]

First, the trial court found the record was clear that Mother, for all intents and

---

53. The trial court noted Dr. Bradford frequently testified before the trial court as an expert witness and the trial court found his testimony to be extremely credible.

54. In compliance with section 211.447, the trial court considered and made findings on the following factors:

[Child] has been neglected by [Mother] abused and/or neglected. In reaching this conclusion, the Court has considered and

purposes, both abandoned and neglected Child beginning when he was an infant. Hospital records show that Mother left Child at the hospital without notifying staff, without providing the hospital her correct contact information, and without making any provisions for Child. Mother's actions during Child's first days of life, foreshadowed her pattern of abandonment and neglect for months and years thereafter.

While Mother had custody of Child, she lived in multiple homes, all of which were substandard. Mother elected to remain illegally in the U.S., instead of returning to Guatemala where she had two other children she had not seen for years, an extended family, and lawful residency.

The trial court found Child's lack of medical treatment while in Mother's care and subsequently Maria's care, very probative on the issue of neglect. Mother missed multiple doctor appointments for Child and he did not receive all of his early childhood immunizations. Child also had poor development, folded ears, and a flat head, all evidence of neglect and lack of care, concern, and nurturing on the part of his caregivers.

With respect to the evidence after her arrest in May 2007, the trial court found the evidence clearly showed Mother had little, if any, concern for Child while in jail. Mother knew where Child was during her incarceration, but she did nothing to communicate with him or to provide for his support. Despite having calling cards, access to a phone, and the ability to send letters free from jail, Mother did nothing. Mother knew where Child was living during this time and had the ability to contact

makes the following findings in compliance with [s]ection 211.447.5(2)(a)–(d):

i. Whether there exists a mental condition that is either permanent or has no reasonable likelihood of being reversed that would render the parent unable to knowingly provide the child with the necessary care, custody and control. No evidence was presented that [Mother] suffered from such an irreversible or permanent mental condition.

ii. Whether there is a chemical dependency that would prevent the parent from consistently providing the necessary care, custody and control of the minor child and that cannot be treated so as to enable the parent to consistently provide such care, custody and control. No evidence was presented that [Mother] suffered from an unbeatable chemical dependency.

iii. Whether there was a severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another person under circumstances that would indicate that the parent knew or should have known that such acts were being committed. No evidence was

presented that [Child] was subjected to such act by [Mother].

iv. Whether there was a repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate · food, clothing, shelter or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. As set forth herein, [Mother], although physical [sic] and financially able, has failed to provide [Child] with adequate food, clothing, shelter or education as defined by law, and other care and control necessary for [Child]'s physical, mental, or emotional health and development. As further set forth herein, [Mother] abandoned and neglected [Child] for nearly three years following her arrest in 2007. There was no evidence presented of an inability on the part of [Mother] to maintain at least a minimal financial or parental relationship with [Child]. [Mother's] failure to stay in contact with [Child] and support [Child] appears to be due more to her lack of desire to do so as opposed to an inability to do so.

the Velazcos by either writing to them or by phone; however, she did neither.[55] Mother maintained contact with Maria as evidenced by the numerous phone calls to her, during which Mother made only minimal inquiries about Child. This same course of conduct continued while she was incarcerated in federal prison.

Once released from prison, Mother continued in her failure to send money or support to Child. Even though Mother was working a full-time job, she waited more than a year before making token payments to Child totaling $100, although she clearly had sufficient income and resources to make larger payments on behalf of Child. This $100 was the only money she provided for his support over nearly four years despite having the resources to do so.[56] Her efforts in this respect were *de minimis*. The trial court found the reality was that Mother simply disappeared from Child's young life and did nothing.

### Trial Court's Conclusion Mother is Unfit Parent

The trial court also found that pursuant to section 211.447.5(6), Mother was unfit to be a party to the parent-child relationship because of specific conditions directly relating to the parent-child relationship that were of such a duration or nature as to prevent Mother from providing for the mental, emotional, and physical needs of Child for the reasonably foreseeable future. This finding was determined by a totality of the circumstances, including the following facts:

[Mother's] continued engagement in criminal activity after the birth of [Child], her continued failure to seek information about him, her medical, physical and nutritional neglect of him, her continued failure to provide support for him, her continued failure to attempt to communicate or contact him, and her expressed intentions to reengage in new criminal activity along with her two children from Guatemala should [she] be deported in the future.

The trial court recognized that Mother's prior incarceration was not, in and of itself, a ground for termination of parental rights. Similarly, the fact Mother entered the U.S. illegally, is not well educated, and speaks Spanish as her primary language, cannot be grounds for termination. Nonetheless, the trial court found these factors, along with the fact that Mother was incarcerated shortly after Child's birth, did not relieve her from her duties and obligations as a parent to provide Child with a continuing financial and emotional relationship. Despite having some means and ability to provide for Child's care and well-being, Mother simply chose not to do so and continued to fail in her obligations as a parent to Child in the years that followed.

As of the date of trial, Mother's ability to parent Child had not substantially improved from her condition in 2007, rather, it had worsened. Mother failed to provide any evidence to the trial court of her ability to maintain suitable independent hous-

55. As previously noted, there was a difference in testimony as to when Child began living with the Velazcos. During the trial, Maria and Geronomo testified Child was still living with them during much of the critical period in question. However, the trial court did not find their testimony credible. Instead, the trial court believed Jennifer, who testified Child resided with her and her family during

the sixty-day look-back period until Child began living with Adoptive Parents in October 2007.

56. Mother also received nearly $10,000 in income tax refunds, although not entitled to these funds. When she received the money, half of it was sent out of the country to a foreign account.

ing, or her ability to provide for Child's financial or emotional support in the near future. Furthermore, Child speaks only a little Spanish, Mother has made no concentrated effort to learn English, and in Guatemala, she knows no one who speaks English.[57]

Further supporting the trial court's finding that Mother is unfit to be a party to the parent-child relationship was Dr. Bradford's testimony. After due consideration of the entirety of the evidence presented, the trial court agreed with Dr. Bradford that reunification could, at best, take years, and might not ever occur—"[t]hese are simply years that Child no longer has available to him to be in a 'holding pattern' while he waits for the highly unlikely possibility," based on the evidence at trial, that Mother will "somehow transform herself into a fit and able parent." The trial court did not believe reunification could take place, or that reunification would be in the best interest of Child.[58]

Based on the evidence submitted at trial, the trial court believed Mother's separation from Child and the lack of a bond between her and Child, rendered her unable, for the reasonably foreseeable future, to care appropriately for Child's ongoing physical, mental, or emotional needs.

## Evidence of Harm to Child if Continued Relationship With Mother

As part of the trial court's determination whether to terminate Mother's parental rights, the trial court considered, at the time of the termination and looking to the future, whether Child would be harmed by a continued relationship with Mother. The trial court looked to the totality of Mother's conduct, including conduct before and after the filing of the petition, to address the argument that a parent has reformed since the filing of the petition.

After Mother's first illegal entry to the U.S., she was detained approximately one month and then deported. Shortly thereafter, she returned, assumed a false identity, used a stolen social security number, was again arrested, and eventually sent to a federal prison. If she is again deported, Mother plans again to illegally re-enter the U.S., and has stated that she also may expose her other children, including her young daughter with psychological problems, to these risks.

The trial court found it clear from Mother's testimony that she is well aware she and her children could be harmed or even killed if she attempts to again illegally re-enter the U.S. Mother is also aware she is at risk of being arrested, prosecuted, and again sent to prison if she is apprehended

**57.** As noted, the trial court found Mother does speak some English as she inadvertently demonstrated at trial. However, if Mother remains in the U.S., she plans to have Maria's seven-year-old daughter act as a translator for her and teach Spanish to Child.

**58.** The trial court found Mother "either [did not] understand how difficult and time-consuming it would be for [Child] to be reunited with her or she simply [did not] care about the impact that [reunification] would have on [Child]'s psychological and emotional well[-]being [if he were] removed from [Adoptive Parents.]" The trial court found Mother's actions following the initial decision by

this Court when she demanded Child "be immediately" returned to her was evidence she had "no regard to the impact … immediate removal [of Child] from [Adoptive Parents] would have [on Child.]" Although Mother has since modified her position, the trial court was not convinced she would be willing to engage in a lengthy period of reunification. Mother's "cavalier attitude" towards this issue was very telling to the trial court and seriously called into question her ability to properly parent and care for Child at this time or in the reasonably foreseeable future.

in the U.S. If this happens, her children would either be deported or placed into foster care in the U.S. Despite these significant risks, Mother is willing to expose her children to these dangers.[59] Mother's disturbing testimony convinced the trial court that Child risks future harm if he is returned to Mother. The trial court stated, "Frankly, she is not only a risk to herself but a risk to [Child] and her other children if she persists in this plan."[60]

### Trial Court's Findings on Best Interest of Child

In deciding whether or not to terminate the parent-child relationship, the trial court considered and made findings on the seven best-interest factors in compliance with section 211.447.7(1)–(7). The trial court then considered each of the following factors in greater detail, and found it would be in the best interest of Child to terminate Mother's parental rights and to allow adoption by Adoptive Parents:[61]

1. ***Emotional ties.*** Child has no emotional bond to Mother since he last saw her when he was an infant. He is aware that he is adopted and has another "mommy" but beyond that, he is unaware of the existence of Mother.

2. ***Maintained regular contact.*** Mother has not maintained contact with Child. Her last physical contact was in May 2007. During her incarceration, she had no contact with him, and did not send any notes, cards, letters, or drawings to Child. After her release, she waited a year before requesting contact with Child.

3. ***Payment for cost of care and maintenance.*** Mother did not provide any support to Child despite having resources available to do so. Her first attempt at support was not until 2011, but those attempts were found to be token since she had been released from prison for a substantial period before she making those efforts.

4. ***Additional services.*** Child was never under the care of the Children's Division and the termination-of-parental-rights action was brought by Adoptive Parents instead of the State in connection with their Amended Petition, as allowed by law. Nonetheless, the trial court noted Mother never requested any services from the State, and if such services had been requested, especially if they had been requested while she was incarcerated, services could have been provided to her. She also failed to request services after her release. Even prior to her arrest, Mother only made sporadic use of services that could have assisted her with Child such as WIC and medical care.

5. ***Mother's disinterest in or lack of commitment to Child.*** The trial court found for the vast majority of Child's life, Mother expressed little interest in caring for Child.

---

59. Although Mother's testimony was contradictory, the trial court found Mother's past actions suggest she will return to the U.S. illegally instead of remaining in Guatemala. The only question in the trial court's mind was whether her children would remain in Guatemala or come with her to the U.S.

60. The trial court noted that parental unfitness is oftentimes determined by past and present actions, and not from an announcement by a parent of their intention to commit future crimes and put their children at risk of harm. However, Mother did just that.

61. The trial court first noted that the determination of whether termination of parental rights is in the best interest of Child is based on the totality of the circumstances and the submissions required by the statute, together with all of the admissible evidence submitted in this case, including, but not limited to, all of the facts and evidence set forth in the trial court's Judgment.

6. *Felony conviction.* Mother is a convicted felon subject to deportation. As a result, Child will either be separated from her or removed to Guatemala with her, and if that happens, Mother testified she will attempt to illegally re-enter the U.S. with Child.

7. *Deliberate acts of parent subjecting Child to substantial risk of physical or mental harm.* Mother abandoned Child at the hospital after his birth, persisted in criminal behavior, and failed to make any advance arrangements for the care of Child should she be detained due to her criminal behavior.

Dr. Bradford's testimony also established that it would be in the best interest of Child for the rights of Mother to be terminated.[62]

Child's GAL [63] reviewed all of the evidence, sat through depositions and trial, met the parties, and interacted with them. Having heard all of the evidence and considering all of the factors in this case, the GAL recommended termination of Mother's parental rights, and also recommended it would be in the best interest of Child to be adopted by Adoptive Parents. The Juvenile Office was also a party in this matter and joined in the GAL's recommendation.

An Investigation and Social Summary ("Summary"), was prepared as required pursuant to section 211.455.3, and the trial court considered the content of the Summary in making a determination as to the best interest of Child. The content of the Summary also indicated that termination of parental rights was in Child's best interest.

**The Trial Court's Conclusions of Law**

The trial court found clear, cogent, and convincing evidence established that Mother abandoned and neglected Child during the applicable time periods under chapters 211 and 453 and, therefore, her consent was not required for the adoption of Child by Adoptive Parents. The trial court also found Mother was unfit to further serve as a parent to Child, and there was little likelihood that within an ascertainable period of time, she would be able to become a fit and able parent to Child. Finally, the trial court determined it would be in the best interest of Child for the trial court to terminate the parental rights of Mother, and to allow the adoption of Child by Adoptive Parents.

The trial court found Adoptive Parents were eager and willing to adopt Child, had the ability and willingness to continue to provide for Child, were committed and devoted to Child, and "will continue to properly provide him with excellent and consistent care, education, medical attention, and a safe and stable home environment, just as they have done since he first came into their home." The trial court made it very clear that its observations and findings about Adoptive Parents only factored into the best-interest issue. The trial court concluded that Adoptive Parents were a suitable adoptive family and that adoption

---

**62.** The trial court also considered the testimony of Mother's expert Antuna.

**63.** The trial court noted Child's GAL is an extremely experienced Guardian who has participated in countless termination actions. She has represented parents who face termination and she has represented children as their Guardian. The [trial c]ourt specifically chose her because it knew that she would enter the case with no preconceived notions as to what should be the outcome. She would also be fair to both [Mother] and to [Adoptive Parents] and her recommendation would only be based on [what] the evidence was and what she believed to be in the best interest of [Child].

of Child by Adoptive Parents would be in Child's best interest.

Mother's parental rights were terminated and this appeal followed. Mother raises 14 points of error on appeal, many of which were addressed and answered by the Supreme Court in *C.M.B.R.* Like Mother's previous appeal, her claims of error are most easily understood and addressed by grouping them together, as she does, in "Parts." Mother makes the following claims:

**Part One.** The proceedings failed to strictly comply with statutes as follows: Point I—failure to strictly comply with placement requirements found in section 453.014.1(4); Point II—failure to strictly comply with the statutorily mandated requirements for investigations, assessments, written reports and recommendations as required by sections 453.026; 453.070, 453.077, and 453.080;[64] and Point III—failure to strictly comply with required transfer court order, notice to Mother, counsel appointment requirements, and services provided to Mother in violation of section 453.110.1 & .3,[65] and Rule 44.01(d).

**Part Two.** Point IV—the trial court failed to properly weigh the "substantial evidence in opposition."

**Part Three.** Mother's due process rights were violated because: Point V—the juvenile office failed to discharge its duties to act diligently in the best interest of Child; Point VI–Mother did not have legal counsel for ten months; Point VII—combining the termination and adoption proceedings interjected Adoptive Parents' fitness into termination proceedings improperly; and Point VIII—the trial court considered immigration status and alleged crimes, which were legally irrelevant.

**Part Four.** The trial court's findings on the grounds for termination were contrary to law and not supported by clear, cogent, and convincing evidence in that: Point IX—the evidence negates any finding of willful abandonment during the 60–day period preceding the filing of the Petition under chapter 453; Point X—the evidence negates any finding of willful abandonment under chapter 211; Point XI—the evidence negates any finding of willful, substantial, and continuous neglect during the six-month period preceding the filing of the Petition under chapter 453; Point XII—the evidence negates any finding of neglect, in that the trial court ignored the present conditions; and Point XIII—the evidence negates any finding of unfitness in that the trial court ignored the present conditions and improperly considered immigration status.

**Part Five.** Point XIV—misapplication of best-interest test.

Adoptive Parents argue the Supreme Court already decided against Mother on the issues she raised in Part One. With respect to Part Two—Point IV—Adoptive Parents argue the trial court considered all of the evidence, Mother's argument fails to demonstrate any analytical value or persuasiveness, and there was no error in the trial court's findings. Adoptive Parents argue Mother was not denied due process in response to Mother's claims in Part Three; Mother's claims in Part Four are analytically useless in that they fail to follow the framework of *Houston v. Crider*, 317 S.W.3d 178 (Mo.App.S.D.2010), and the evidence supports the trial court's Judgment. Finally, Adoptive Parents ar-

**64.** References to sections 453.070 and 453.080 are to RSMo Cum.Supp. (2001).

**65.** References to section 453.110 are to RSMo Cum.Supp. (2004).

gue Mother's allegation in Part Five that the trial court misapplied the best-interest test is a last-resort argument because the trial court carefully distinguished the evidence in the best-interest analysis, and made eight pages of findings of fact on the best interest of Child.

The issues for our determination are:

1. Whether the trial court failed to comply with the statutorily mandated requirements resulting in reversible error.

2. Whether the trial court failed to properly weigh the "substantial evidence in opposition" as alleged by Mother.

3. Whether Mother's due process rights were violated resulting in reversible error.

4. Whether the trial court's Judgment terminating Mother's parental rights is supported by substantial evidence on one or more grounds for termination of parental rights as set forth in sections 211.447.2(2)(b), 211.447.5(2) & (6) and 453.040(7).

5. Whether the trial court abused its discretion in finding termination of Mother's parental rights was in the best interest of Child.

## Standard of Review

 "In terminating parental rights, the trial court must find by clear, cogent, and convincing evidence that one or more [statutory] grounds for termination exist … and … the trial court must find that termination is in the best interests of the child." *C.M.B.R.*, 332 S.W.3d at 815 (internal quotation and citation omitted). We review whether clear, cogent, and convincing evidence exists to support a statutory ground for termination under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Id.* In accordance with *Murphy*, we will affirm the trial court's Judgment terminat-

ing parental rights "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong." *In re S.M.B., Jr.*, 254 S.W.3d 214, 218 (Mo.App. S.D.2008).

 "The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing[ ]"; therefore, "we review the record very closely to ensure this awesome power was properly exercised." *In re L.M.*, 212 S.W.3d 177, 181 (Mo.App.S.D.2007) (internal citation omitted).

## Analysis

While this case reveals problems inherent with termination of parental rights of undocumented immigrants, the fact that Mother is an undocumented immigrant is not grounds standing alone for the termination of Mother's parental rights *in this matter*. This issue is addressed fully in response to Mother's Point VIII.

Because of the way Mother's issues are raised and our disposition of them, they will be addressed out of order. We begin our analysis with Mother's Parts Four and Five, in which Mother claims the trial court erred in finding grounds for termination of her parental rights and that termination was in Child's best interest.

### "Part Four": Findings and Legal Conclusions for Grounds for Termination (Mother's Points IX, X, XI, XII and XIII)

In this case, Mother's parental rights were terminated on four statutory grounds, in addition to finding termination in Child's best interest. The trial court

found the following statutory grounds to be supported by clear, cogent, and convincing evidence: (1) abandonment under section 453.040(7); (2) abandonment under section 211.447.2(2)(b); (3) neglect under section 453.040(7); (4) neglect under section 211.447.5(2); and (5) unfit parent under section 211.447.5(6). Mother challenges the trial court's findings on all five grounds for termination of parental rights as "contrary to law and not supported by clear, cogent and convincing evidence." Mother argues that not *one* of the trial court's findings of fact—136 paragraphs in all—are supported by substantial evidence.

We need only find one of these statutory bases was supported by substantial evidence to sustain the Judgment. *See In the Interest of C.L.W.*, 115 S.W.3d 354, 356 (Mo.App.S.D.2003). *See also In re A.M.F.*, 140 S.W.3d 201, 205 (Mo.App.S.D. 2004) ("Where multiple statutory grounds for terminating parental rights are found, a reviewing court need only find that one of these bases is supported by the record and that termination of parental rights was in the best interest of the child."). Because we find there is substantial evidence to support the finding that Mother neglected Child, we need only address Mother's allegations of error found in Points XI and XII based on this ground.

Neglect has been defined "as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *In re M.J.H.*, 398 S.W.3d 550, 561 (Mo.App.S.D.2013). Neglect has also been described as the "failure to fulfill the duty imposed upon the parent by law and by conscience." *In re Adoption of Z.T.H.*, 910 S.W.2d 830, 835 (Mo.App.W.D.1995).

Section 453.040(7) provides the consent of a parent is not required if for a period of "at least six months immediately prior to the filing of the petition for adoption, [a parent] willfully, substantially and continuously neglected to provide him with necessary care and protection." This time period is often referred to as the "look-back period." In this case, the trial court found the applicable look-back date was April 5, 2007.

Unlike section 453.040(7), section 211.447.5(2) does *not* specify a look-back period for a neglect finding, but rather requires the trial court to consider and make findings on four various factors in making a determination of neglect. Here, the trial court reviewed evidence, considered and made findings on the required factors in compliance with section 211.447.5(2), and found no evidence was presented of the first three factors. With respect to the final factor, the trial court found:

> As set forth herein, [Mother], although physical [sic] and financially able, has failed to provide [Child] with adequate food, clothing, shelter or education as defined by law, and other care and control necessary for [Child]'s physical, mental, or emotional health and development. As further set forth herein, [Mother] abandoned and neglected [Child] for nearly three years following her arrest in 2007. There was no evidence presented of an inability on the part of [Mother] to maintain at least a minimal financial or parental relationship with [Child]. [Mother's] failure to stay in contact with [Child] and support [Child] appears to be due more to her lack of desire to do so as opposed to an inability to do so.

The trial court concluded Child had been neglected by Mother under both section 453.040(7) and section 211.447.5(2).

■ There was evidence from which the trial court could find that Mother neglected Child, not only for six months prior to the Petition, but back almost to Child's date of birth. Hospital records show that Mother left Child at the hospital without notifying staff and without making any provisions for Child or providing the hospital with working contact information. Approximately 24 hours later, the nursery notes in Child's medical records indicate the hospital had "not heard from [Child's] parents, Skip from SS. Notified, will try to get hold of Mother. Number listed in [sic] not in service." A few hours later, the nursery notes indicate "Skip SS did speak with Mother, she should be here to get infant around 1630[,]" and the records note Mother at hospital at "1730." Mother's behavior and lack of caring during these first critical days of Child's life is consistent with and foreshadowed the pattern of neglect she subjected Child to in the years that followed.

Later, Mother moved in with Bartolome, his "wife," and their three children, where the living conditions were inadequate. At the time of Mother's arrest, she was residing in Bartolome's home. When she was arrested, she did not advise officials she had a child, but instead called a friend to have Maria pick up Child at the babysitter. It was clear Mother had made no arrangements *for a home* for Child should she be arrested and even deported, an ever present risk to Mother and her family due to their undocumented status. Child spent that night with Maria, and the next day, Maria took Child back to Bartolome's home. However, Bartolome was unable to care for Child and returned him to Maria's home several days later.

Mother also made no arrangements *for the care* of Child should she be arrested. There was no evidence she left money to provide for the care and treatment of Child when she was arrested, or money for his transport to Guatemala. Instead, Mother merely left Child's care to the hands of fate, despite knowing that her relatives in the U.S. were financially limited and were also subject to immediate arrest and deportation due to their undocumented status in the U.S.

Mother also failed to provide for Child's care while he was in *her* custody. Mother did not provide Child with proper nutrition. After the birth of Child, she fed Child whole milk,[66] even though formula was available to her free of charge through the WIC program.[67] Mother missed key WIC appointments after Child was born, which would have allowed her to pick up vouchers for free formula at the WIC office in Carthage located only a few blocks away from the various homes in which she lived at the time. There is no explanation for Mother's failure to make use of the services available to her; Maria made use of these services even though she was also an undocumented immigrant, without a driver's license, and living further away from the Carthage WIC office than Mother.

Mother also failed to provide basic and necessary care, including medical care. Mother missed multiple doctor appointments for Child even though they were being provided to her free of charge, and as a result, Child did not receive all of his early childhood immunizations. When

---

**66.** Even at trial, Mother seemed unconcerned about the fact she fed Child whole milk instead of formula. Instead, she attempted to portray that practice as merely a difference in cultures. However, Geronomo confirmed that while Child was being fed whole milk, he had severe digestive problems which resulted in him spitting up and having diarrhea.

**67.** Mother claimed she could not get to the WIC office for her appointments, but the trial court found this testimony not to be credible.

Child had been in Mother's care for nearly six months, he was still in a newborn state. He was unable to sit up on his own, had not received proper immunizations, was developmentally delayed for his age, had trouble supporting his head, and had poor muscle development. Child also suffered from dental neglect at an early age.

Mother's family members continued the pattern of neglect of Child after Mother's arrest. When Davenport unexpectedly encountered Child at Maria's house a couple of weeks after Child began living with them, she was concerned with the care Child was receiving because he was still not receiving proper nutrition and was still developmentally delayed. Maria admitted she was not feeding Child formula, but was instead giving him whole milk. Child was left to languish in a car seat in Maria's home, had developed a flat spot on the back of his head, and did not have proper muscle tone and control for a child his age. He was weak, lethargic, and suffering from a severe rash that bled on his face and arms. The trial court could fairly deduce that little care or attention had been given to Child.

From the evidence presented, the trial court could find that Maria viewed Child as a burden to her and her family and she and her husband did not properly care for him; indeed, Child was neglected by both of them. Davenport was so concerned that she contacted the Velazcos to see if they would be willing to assist in the care of Child. She also collected what formula she could from the PAT office and even stopped on the way back to Maria's home to purchase more formula with her own money.

When Child arrived at the home of the Velazcos, he was suffering from a rash on his face and arms that was so severe it bled. This rash cleared up once he began to receive simple basic nutrition and medical treatment. Child still exhibited some developmental delays, such as delayed muscle tone and strength. His health had not improved during the intervening months he had been living with Maria.

Once Child began living with the Velazcos, Mother's family expressed little, if any, concern for Child. While Child was with the Velazcos, neither Maria nor Geronomo provided any support for Child except for a package of diapers. Maria did not see Child at the Velazcos' home and eventually, Geronomo stopped going to see Child. The Velazcos received no support for Child from Mother.

With respect to Mother, she expressed little, if any, interest in the welfare of Child during the time period Child was with Maria, or with the Velazcos. While in jail, Mother was able to make unlimited phone calls throughout the day and evening, and she took frequent advantage of this privilege by calling Maria collect or by using calling cards she was given or she purchased from the commissary. Out of forty phone calls, Mother asked about Child's well-being during only two of those calls, and did not ask to speak to him or request he be brought to the jail for a visit.

As early as July 13, 2007, Mother was told that the Velazcos were watching Child, and she was given their phone number shortly thereafter.[68] However, the Ve-

68. Mother was previously given the Velazcos' phone number by Maria, but alleged the number was taken when her room was "rummaged." Mother asked for their number again on August 20, 2007, because Immigration asked for the phone number of where Child was located. Mother "only wanted [the phone number] to give it to the lawyer and to [I]mmigration because on the twenty-eighth [she had] an interview with [I]immigration."

lazcos received no communication from Mother while caring for Child.[69]

Mother was also able to send up to three letters per week from jail free of charge. Yet Mother failed to take advantage of these free resources to inquire about the well-being of Child.

Even when Mother learned that Maria had not been staying in touch with the Velazcos and did not know how Child was doing, Mother made no attempt to make contact by phone or letter, with Child, the Velazcos, or Adoptive Parents, or to have someone else check on his well-being. Mother's only attempt to contact the Velazcos occurred after the Petition was filed. Even then, those attempts were minimal in effort and the trial court gave little, if any, weight to them. After those few attempts at contact, there were no further attempts of contact by Mother or any member of her family. Even after the Petition was served on Mother, she made no attempt to reach out to Adoptive Parents although their names and address were in the first paragraph of both petitions, as well as the name, address, and phone number of their attorney.

This same course of conduct continued while Mother was incarcerated in federal prison. There, she worked and earned money for her commissary account, and had mail and phone privileges. However, Mother did not attempt to reach out to Child or to check on his well-being.

With respect to the time period following her release from prison, Mother claimed she was unaware of Child's location in Carthage; however, the trial court found this claim was not credible noting that Carthage is a relatively small town and the Guatemalan population is close knit. Adoptive Parents are active in the Guatemalan community and live next to the Guatemalan bakery. Their phone number is in the phone book and during trial, evidence was received that a vehicle belonging to Maria's family was frequently parked outside of Adoptive Parents' residence.

Mother's neglect of Child is also demonstrated in her failure to provide financial support, without just cause or excuse, whether or not ordered to provide such support by judicial decree. *Z.T.H.*, 910 S.W.2d at 835. "The financial support of a minor child is a continuing parental obligation, and a parent has a duty to contribute as much as he or she can." *M.J.H.*, 398 S.W.3d at 561 (internal quotation and citation omitted). If a parent fails to provide support, the parent must then show why this failure is not willful. *Z.T.H.*, 910 S.W.2d at 835–36. Mother failed to do so.

Despite having money in her account while incarcerated, Mother did not send *any* money or support to Child from May 22, 2007, until she was discharged from federal prison in February 2009. "Contribution, no matter how minimal, demonstrates a parent's intent to continue the parent-child relationship." *In re J.M.L.*, 917 S.W.2d 193, 196 (Mo.App.W.D. 1996). While we acknowledge that incarceration may limit the parent's ability to maintain contact and support his or her child, incarceration of a parent does not preclude a trial court's finding of neglect as grounds for termination of parental rights. Mother may not rely upon her incarceration as a reason for failing to contribute any money toward Child's support because incarceration did not discharge Mother's obligations to Child. *See In re L.N.D.*, 219 S.W.3d 820, 828 (Mo.

---

**69.** Although Mother later denied any knowledge that she knew the Velazcos were caring for Child, the trial court did not find her denials on that issue credible.

App.S.D.2007) (parent's incarceration does not relieve them from their obligation to make a minimal financial contribution for child's support).

■■■ We also acknowledge that an incarcerated parent's contribution "will not significantly assist in providing the parent's child with essentials," but instead, it shows the parent's intent to continue the parent-child relationship. *In re M.L.K.*, 804 S.W.2d 398, 402 (Mo.App.W.D.1991). Evidence of this intent is lacking when the parent fails to make any contribution, no matter how small the amount. *Id.*

By her actions, Mother showed no intent to continue the parent-child relationship. Mother did not use any of the money she received while incarcerated to make a financial contribution for Child while Child was with Maria or with the Velazcos. Over the ten months Mother was incarcerated in the St. Clair County Jail, she had $350 deposited in her account from money received from family, friends, and church friends.[70] Mother spent $52.71 at the jail commissary on phone cards and other items. Mother testified at trial that she received money from her church to be used "to buy things from the commissary" because the "food was not very good there."[71] When Mother left St. Clair County, she had $297.29 left in her account that was transferred with her to federal prison. Once transferred to West Virginia, Mother continued to receive money from a church, and also worked to earn money for her commissary account. Rather than contributing toward the support of Child, Mother kept the money she received "on reserve."

Despite continually receiving money while incarcerated, from May 2007 until her release in February 2009, Mother did not contribute anything toward Child's support. Mother did not take advantage of the free resources available to her to show intent to continue the parent-child relationship, such as sending cards or letters. Mother was able to send letters to church members requesting money, yet there was no evidence she sent letters requesting church members provide support or items for Child. However, Mother was able to purchase food from the commissary, purchase phone cards, etc.

Once released, Mother continued in her failure to send money or support to Child. When Mother got out of prison in February 2009, she obtained authorization from the U.S. government to work, and started working fulltime. Her gross income in 2010 was $16,190, and in 2011 her gross income was $21,774. At the time of trial, Mother had a net monthly income of $1,365, after paying for necessities, rent, and the modest support she sent to her other children and family in Guatemala.

Mother also received additional benefits from the U.S. government following her release from prison. Although not entitled to do so, Mother sought and received child tax credits for Child. In doing so, she received nearly $10,000 in income tax refunds.[72] A portion of this money was sent out of the country to a foreign account.

---

**70.** Mother wrote at least three letters to Corina requesting money while incarcerated. She received money from her church, $500 from the Guatemalan embassy when she visited Washington, D.C., and additional unknown amounts from the Guatemalan embassy during and after her incarceration.

**71.** Mother also testified she used the money to buy phone cards so she "could call [her] sister to see how [Child] was doing." As previously noted, we reviewed approximately forty calls between Mother and Maria, and Mother specifically asked about Child's well-being in only two of those calls.

**72.** Although this money was eventually returned to the IRS, it was not until *after* the trial testimony of Mother's tax preparer on February 29, 2012, that "new tax returns

Even with money in her prison account, the ability to work once released from prison, and a net monthly income of over $1,000 *after taxes and necessities,* Mother did not send support for Child until April 2011, *more than two years after she was released from prison* and nearly four years after she was first arrested. Even then, she made token payments to Child totaling $100, despite having sufficient income and resources to make larger payments on behalf of Child. Her efforts were *de minimis.*

In terms of communication, Mother took virtually no steps to communicate with Child. As previously noted, Mother could have sent Child up to three letters a week for free while incarcerated, but she did not. Mother could have sent cards or letters to Child since she had a full-time job and having several thousand dollars in her bank account at any given time, yet Mother sent no cards, necessities, or gifts to Child.

Looking at the "totality of [Mother's] conduct both prior to and after filing of termination petition ... [and] past patterns" of Mother, provides vital clues to her present and future conduct. *In re K.A.W.,* 133 S.W.3d 1, 9–10 (Mo. banc 2004) (internal citations omitted). The evidence supports the trial court findings that Mother neglected her relationship with Child such that Mother's consent was unnecessary, pursuant to section 453.040(7). Likewise, Mother's consent was unnecessary pursuant to section 211.447.5(2).

We find the trial court's finding of neglect is supported by substantial evidence in the record, is not against the weight of the evidence, and did not erroneously declare or misstate the law. *See Murphy,* 536 S.W.2d at 32. Accordingly, Mother's Points XI and XII are denied. Because we affirm the trial court's findings on neglect, we need not address the abandonment and unfit parent findings because one statutory ground is sufficient to sustain the trial court's Judgment.

### "Part Five": Best Interest of Child (Mother's Point XIV)

In Part Five, Mother challenges the sufficiency of the evidence to support the trial court's conclusion that termination of Mother's parental rights was in Child's best interest.

After determining one or more statutory grounds for termination have been proven, this Court must determine whether termination of parental rights was in the best interest of Child. *C.M.B.R.,* 332 S.W.3d at 815–16. "At the trial level, the standard of proof for this best-interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion." *Id.* at 816.

Section 211.447.7 sets forth seven factors for the court to evaluate and consider in deciding whether termination of the parent-child relationship is in a child's best interest.[73] Determining a child's best

---

were prepared" for Mother for the years 2009, 2010 and 2011, and money returned to the IRS.

**73.** Those factors are:
(1) The emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the

child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

interest is a subjective assessment based on the totality of the circumstances. *C.A.M.*, 282 S.W.3d at 409. There is no requirement that all seven of these factors must be negated; likewise, there is no minimum number of negative factors required for termination. *Id.*

In this case, the trial court considered each factor under section 211.447.7, and in response to each of the seven factors, the trial court found that: (1) Child did not have any emotional ties to Mother; (2) Child had no visitation or contact with Mother since May 2007 when he was an infant; (3) Mother failed to provide financial or in-kind support to Child until 2011 when she made only token payments; (4) there was little likelihood that within an ascertainable period of time, additional services would likely bring about a lasting parental adjustment to enable Child to return to Mother; (5) Mother demonstrated a lack of interest and commitment to Child—she abandoned and neglected Child beginning at his birth; (6) Mother was a convicted felon subject to deportation so Child would either be separated from Mother or removed to Guatemala with Mother, and Mother testified she would then attempt to illegally re-enter the U.S. with Child; and (7) Mother abandoned Child at the hospital, engaged in criminal behavior knowing such behavior could subject her to incarceration and deportation, and still failed to make arrangements for

the care of Child should she be detained. The trial court's finding on each individual factor is supported by the record.

■ Mother's argument against the trial court's best-interest finding is simply a recitation of facts and inferences favorable to her position, while ignoring evidence favorable to the trial court's findings and conclusions.[74] Mother fails to follow our standard of review, which prevents this Court from crediting evidence or inferences in favor of the terminated parent. *B.J.K.*, 197 S.W.3d 237, 247 (Mo.App.W.D. 2006); *C.M.B.*, 55 S.W.3d 889, 895–96 (Mo. App.S.D.2001). Not only did the trial court specifically consider each factor in compliance with section 211.447.7, the Judgment also includes eight pages of additional findings of fact supporting the trial court's best-interest determination. *See L.M.*, 212 S.W.3d at 186–87 (holding the statutorily required "best-interest" findings serve as an aid to the trial court in deciding best interest, but are not the only considerations).

The trial court's best-interest finding is based on the totality of the evidence before the court. *Id.* at 187. Here, there was overwhelming evidence before the trial court that it was in the Child's best interest to terminate Mother's parental rights. To restate the substantial evidence in support of the trial court's best-interest finding is unnecessarily repetitive. Rather, it

(5) The parent's disinterest in or lack of commitment to the child;
(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

§ 211.447.7(1)–(7).

74. Mother also argues the trial court did not protect her constitutional rights or the birth family relationship as required under section 211.443. However, Mother fails to identify evidence in the record that points to, or explains how the trial court failed to consider these additional factors found in section 211.443. Without further explanation, Mother's argument fails.

is sufficient to state that the record amply supports the trial court's findings. *See In re P.L.O.*, 131 S.W.3d 782, 791 (Mo. banc 2004) (holding it would be "unnecessarily repetitive" to restate the evidence as it bears on each factor of section 211.447(7)).

After careful review, we conclude the trial court did not abuse its discretion in finding termination was in Child's best interest. Furthermore, we find the trial court's best-interest findings are supported by the record. Mother's Point XIV is denied.

### "Part Two": Mother's Claim of Substantial Evidence in Opposition (Mother's Point IV)

Next, we review Part Two of Mother's brief, which includes only one point, Point IV, in which Mother alleges the trial court failed to properly weigh the substantial evidence in opposition to termination. At the outset, we note Mother's Point IV, in both the point relied on and argument portion, grossly violates Rule 84.04. *C.A.M.*, 282 S.W.3d at 405 n. 5 (noting "[m]ultiple claims of error in one point relied on renders the point multifarious and therefore a violation of Rule 84.04."). Mother's argument includes a 41–page chart ("the chart") "describ[ing] the [alleged] failings of the evidence relied on by the Juvenile Court and the substantial evidence ignored by the Juvenile Court[.]" This chart contains dozens of claims of error, none of which are raised in her point relied on, making Point IV exceedingly multifarious. Again, because of the gravity of terminating parental rights, and given the nature and history of this case, we will address *ex gratia* what we understand the merits of Mother's Point IV to be.

 Vital to a review of Mother's allegations of error in Point IV, is our standard of review. As previously noted, "[a] trial court's decision to terminate parental rights is reviewed under the well-known standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)." *C.L.W.*, 115 S.W.3d at 355. We will affirm the trial court's judgment terminating parental rights "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." *Id.* "[W]here the resolution of conflicting testimony is required to determine the merits of an against-the-weight-of-the-evidence argument, we defer to the trial court's credibility determinations in the same manner as in the resolution of a not-supported-by-substantial-evidence argument." *Houston*, 317 S.W.3d at 186. "We defer to the fact-findings of the juvenile court and consider all evidence and reasonable inferences in the light most favorable to the judgment." *N.J.S.*, 276 S.W.3d at 400.[75]

 Mother's multiple claims of error in Point IV fail because she disregards our principles of review. Although we review the record closely, we must keep in mind that the trial court was in a better position to judge the credibility of the witnesses— the trial court was present to hear their testimony and observe the witnesses firsthand. The trial court was free to believe all, part, or none of the witnesses' testimony. *B.C.K.*, 103 S.W.3d. at 322. As the reviewing court, we also presume the trial court properly considered all the evidence, stated the facts, and followed the law unless that presumption is refuted by the record. *Mamoulian v. St. Louis University*, 780 S.W.2d 648, 652 (Mo.App.E.D.

---

**75.** In addition, "[a]ll fact issues upon which no specific findings were made by the trial court shall be considered as having been found in accordance with the result reached, and the judgment will be upheld on any reasonable theory supported by the evidence." *Nail Boutique, Inc. v. Church*, 758 S.W.2d 206, 208 (Mo.App.S.D.1988).

1989); *Harris v. Parman,* 54 S.W.3d 679, 685 (Mo.App.S.D.2001).

Here, Mother points to facts and seeks to draw inferences supporting her view of the case, but minimizes, overlooks, or ignores the voluminous evidence, facts and inferences all described above and in this point, which overwhelmingly support the trial court's findings. Mother argues the trial court indulged in negative inferences against Mother, disregarded the presumption for preserving the natural parent-child relationship, and relied on evidence that is inconsistent and contradicted by other substantial evidence. Yet, Mother fails to show how, when, or where *the record* refutes the presumption that the trial court properly considered all the evidence, stated the facts, and followed the law. It appears Mother attempts to do so by including the chart of "erroneous findings." However, the chart merely points out the evidence favorable to Mother's view of the case, and does *not* refute the presumption that the trial court considered all the evidence.

One example, can be found by looking at Mother's response to paragraph 26 of the Judgment, where the trial court concluded as follows:

At some point during the summer of 2007, the Velazcos became a full[-]time placement for [Child]. Although the witnesses disagreed as to when that actually occurred, the [trial c]ourt finds [Jennifer]'s version to be credible. According to her, she believes that the first weekend they kept [Child] was the weekend of July 7, 2007. Maria and Geron[o]mo dispute that date and the circumstances under which this arrangement occurred but the [trial c]ourt does

not find their testimony on these issues to be credible.

This finding was relevant to the Judgment because the trial court found Mother abandoned Child during the 60–day look-back period found in section 453.040(7):

The consent to the adoption of a child is not required of:

A parent who has for a period of … at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child[.]

§ 453.040(7).

Mother argues Child was with her sister during the 60–day look-back period negating a finding of willful abandonment under section 453.040(7). In the chart, Mother argues the trial court ignored inconsistencies in the Velazcos' testimony, that the Velazcos' testimony conflicted with Mother's witnesses, the finding cannot be reconciled with Davenport's testimony, and the finding contradicts recorded phone conversations.[76]

 The bottom line is there was conflicting evidence and the trial court had to assess this evidence and come to a conclusion. The trial court's conclusion the Velazcos became a full-time placement of Child in the summer of 2007, is supported by the following evidence.

Jennifer testified the initial plan was for them to provide daytime childcare only. The arrangement where she and her husband watched Child during the day only lasted a week or two because Maria and Geronomo were finding it inconvenient to pick up Child. So, Jennifer and Oswaldo agreed they would watch Child from Sunday night or Monday morning through Friday night, and then Maria and Gerono-

---

**76.** The trial court's finding of when the Velazcos became a full-time placement for Child is relevant.

mo would watch Child on the weekends. However, Maria and Geronomo still found it inconvenient to have Child with them, so during the summer of 2007, she and Oswaldo became a full-time placement for Child.

The recorded phone conversations between Mother, Maria, and Geronomo also support the trial court's finding that the Velazcos became a full-time placement in the summer of 2007, specifically July 2007. On August 18, 2007, Mother (identified in the exhibit as "EB") had the following phone conversation with Geronomo (identified in the exhibit as "IGD"):

[Mother]: I lost the phone number of the person where my boy is. Could you ... giv[e] it to me?

[Geronomo]: The boy? That boy?

[Mother]: Where my baby is.

[Geronomo]: Huh?

[Mother]: Where my son is.

[Geronomo]: Sorry, He's already been given away. He's been given away already.

[Mother]: *You already told me already.*

[Geronomo]: Yeah, well, the white lady has him.

[Mother]: Yes, but I want the phone number and since the lawyer asked me if I could speak with her I wanted her exact number and name and the last name. She told me (to get) the phone number.

(Emphasis added).

Additional evidence is Davenport's testimony that she visited Child in the Velazcos' home on June 20, 2007, July 11, 2007, and August 17, 2007.

Further supporting the trial court's finding is evidence that Maria viewed Child as a burden to her and her family, and that she and her husband did not properly care

for him. While Maria professed her love and care for Child at trial, there was evidence she was relieved to turn Child's care over to the Velazcos. In fact, during a phone conversation with Mother on August 20, 2007, Maria (identified in the exhibit as "MR") makes the following complaints about caring for Child:

[Maria]: I know, but you have to sign your deportation order. Your son too, because, what do you think? That he doesn't ... he spends allot [sic] of time here too. What do you think it is like with your son here and sometimes I am in the other room trying to get ready to go out somewhere on the weekend? And the boy cries! I buy him milk and then later I don't have any money! ... And it is really expensive. The boy drank a lot of milk *and I got tired of taking care of this child. He cries allot [sic]! ... I don't have time to be holding him around here.*

(Emphasis added)

There was also an overwhelming amount of evidence that called into question the credibility of the testimony of Mother's witnesses, specifically her family. A few examples of the evidence supporting the trial court's finding that the testimony of Maria and Geronomo was not credible are as follows:

In phone calls to Mother, Maria referred to Mother as "stupid," "she just lies," "a pain," "annoying," and "not responsible." When questioned, Maria emphatically denied calling Mother these names even though recordings of the conversations exist.

Mother and Maria's collusion to lie to authorities from the beginning was documented in the phone calls. In a recorded phone conversation from jail on October 10, 2007, the following conversation between Mother and Maria took place:

[Mother]: Now, they were asking me where my family is. We are going to talk again in, I don't know, like about 5 or 6 weeks, they said.

[Maria]: "I don't have family," you tell them!

[Mother]: Uh-huh. That is the understanding that I left with the lawyer. I just went. I went today.

[Maria]: "You know well, I don't have family, just with a friend."

[Mother]: Yes, that is what I have told them. They were asking if I had communicated with them but I am going to say that they are not accepting my calls. And they don't want to tell me how my boy is doing. I am going to say that. And I'll say that they don't have my boy anymore. . . .

The trial court found the testimony of Mother "and her family members is riddled with inconsistencies, nonsensical explanations, and outright lies. Simply put, their explanations and excuses to events that are unfavorable to their position or that conflict with the testimony of other witnesses [is] not credible." After a review of the transcript and legal file, there are too many "inconsistencies, nonsensical explanations, and outright lies" to mention in this opinion.

Another example of Mother's blatant disregard of evidence contrary to her position is her argument in response to the following findings of the trial court:

71. [Mother]'s neglect of [Child] was chronic. In fact, it began shortly after [Child] was born. Hospital records show that on October 19, 2006[,] [Child] was brought from the nursery to [Mother] to nurse. However, [Mother] was missing from her room. Later, the hospital determined that she had left the hospital without notifying staff and without making any provisions for her newborn child.

72. By the next day, [Mother] had still not returned[.] . . . She did not contact the hospital to let them know if she was dead or alive. Since the hospital was unable to locate her and did not know what to do with her newborn son, the staff at the hospital notified Social Services.

Mother argues the trial court's finding is "based on speculation and is inconsistent with the actual medical records . . . [as] there is *zero* evidence that the hospital notified Social Services." (Emphasis in original). Mother's argument is in *direct* conflict with Child's medical records from Freeman Health System regarding Child's birth. Child's records contain a page titled "Social Service Progress Notes" indicating "SS—received call" from Child's baby nurse that Mother left the hospital without signing orders. The nursery notes from October 19, 2006, note Child was taken to Mother to feed, and Mother had left without dismissal so " 'SS' notified." Approximately twenty-four hours later, the nursery notes indicate the hospital had "not heard from [Child's] parents, Skip from SS. Notified, will try to get hold of Mother. Number listed in [sic] not in service." A few hours later, the nursery notes indicate "Skip SS did speak with Mother, she should be here to get infant around 1630[,]" and the records note Mother at hospital at 1730.

Child's medical records clearly refute Mother's claims that there is *"zero"* evidence the hospital called Social Services due to Mother's disappearance following Child's birth, and support the trial court's finding that Mother's neglect of Child began shortly after he was born.

This Court, as part of our duty to review the record closely, has reviewed each para-

graph of the Judgment to which Mother makes a claim of "erroneous findings," along with the legal file, transcript, and exhibits filed with this appeal, and we conclude that each finding of the trial court in the Judgment is substantially supported by testimony and/or documentary evidence in the record.

In addition, a review of the more than 1,750 pages of transcript verifies the trial court considered all the evidence presented. The transcript revealed the trial judge was meticulous in taking notes, making sure he understood the testimony, that the record was clear, and that he kept up with the massive amount of exhibits. The record also makes it clear the trial judge reviewed the exhibits, even questioning a witness about an exhibit.

The only potential proof that the trial court did not consider evidence in opposition to termination is the outcome of the case—termination of Mother's parental rights. Under Mother's theory, a trial court could never terminate parental rights if there is contradictory evidence to termination. This is *not* the law in Missouri. Rather, it is the trial court's role during a trial to judge the credibility of the witnesses and evidence presented. Our standard of review requires we defer to the fact-findings of the trial court because the trial court sits in a "superior position" to "judge the credibility of witnesses and their character, sincerity, and other intangibles that might not be completely shown in the cold record." *Young v. Young,* 59 S.W.3d 23, 29 (Mo.App.W.D.2001) (internal quotation and citation omitted). When there is contradictory evidence, this Court

is "obligated to defer to the trial court's assessment of the evidence[,]" *C.M.B.R.,* 332 S.W.3d at 815, and conflicting evidence will be reviewed in the light most favorable to the judgment. *In re S.M.H.,* 160 S.W.3d 355, 362 (Mo. banc 2005).

Mother's Point IV also appears to challenge the Judgment as both unsupported by substantial evidence and/or against the weight of the evidence. This Court provided the steps required in both a "not-supported-by-substantial-evidence challenge" and an "against-the-weight-of-the-evidence challenge[,]" in *Houston,* 317 S.W.3d at 178. However, Mother fails to complete all of these crucial steps in her analysis. Specifically, Mother fails to identify evidence in the record favorable to the Judgment—step two under each analysis—preventing Mother from satisfying the last step of the analysis under both theories. *Id.* at 187–88. Mother's failure to present "material favorable evidence from the weighing process strips her" argument of "any analytical value or persuasiveness." *Id.* at 189.

Mother's final last argument is the fact the trial court rendered a decision three months after trial demonstrates "the evidence did *not* 'instantly tilt' the scales in favor of termination[.]" (Emphasis in original). This argument is offensive to the trial court and the judicial process that was provided to all parties in this matter, especially Mother.[77] The trial court *specifically* noted on the record in front of counsel, including Mother's counsel, that he would not write the decision until he had a transcript. The parties were further advised that the trial court planned to render

---

77. A reading of the transcript evidences the leeway the trial court gave the parties to admit evidence and put on their case, especially Mother. The admission of evidence is committed to the sound discretion of the trial court. *Lawson v. Schumacher & Blum Chev-* *rolet, Inc.,* 687 S.W.2d 947, 951 (Mo.App.S.D. 1985). The trial court was generous in its discretion to give all parties, especially Mother, a more than adequate opportunity to present their case.

a decision on July 18, so long as the trial court had the transcript. There is no evidence Mother raised any objection to the trial court's plan. The 1,750–page transcript was received in June 2012.[78] A decision three months after the trial, under the facts and circumstances of this case, is further proof that the trial court was careful and thorough in reaching a conclusion and drafting a Judgment consisting of 61 pages. For Mother to suggest otherwise, is a desperate attempt to discredit the trial court's findings.

For all of the above reasons, the trial court properly weighed all the evidence, including the "substantial evidence in opposition" as alleged by Mother. Mother's Point IV is denied.

### "Part Three": Mother's Claim of Due Process Violations (Mother's Points V, VI, VII and VIII)

In Part Three, Mother alleges the trial court's proceeding was "riddled with multiple due process violations."

### Point V—Mother's Claim the Juvenile Office Failed to Act Diligently in Best Interest of Child

■■ Mother first claims she was denied due process because the Juvenile Office failed to act diligently in the *best interest of Child* in "failing to investigate or even speak once with Mother, and undertake an investigation independent of [Adoptive Parents]."

In *C.M.B.R.*, the Supreme Court ordered that on remand, the juvenile officer was to participate in the proceedings so long as Adoptive Parents relied on chapter 211 in their Petition[79] because it "is in [C]hild's best interest for the juvenile officer to participate actively in chapter 211 proceedings." 332 S.W.3d at 821. Adoptive Parents included a claim based on chapter 211 in the Amended Petition and, therefore, the juvenile officer was represented by attorney Belinda Elliston ("Elliston") at the trial on remand. Not only was Elliston present at trial, she participated actively at trial examining witnesses, preserving objections on behalf of the Juvenile Office, and seeking clarity from the trial court on various issues.

The duties of a juvenile officer are prescribed by section 211.401. A juvenile officer shall:

(1) Make such investigations and furnish the court with such information and assistance as the judge may require;

(2) Keep a written record of such investigations and submit reports thereon to the judge;

(3) Take charge of children before and after the hearing as may be directed by the court; [and]

(4) Perform such other duties and exercise such powers as the judge of the juvenile court may direct.

§ 211.401.

A juvenile officer's duties with respect to a termination proceeding includes meeting with the trial court to determine that all parties have been served and request an investigation and social study, and *may* also include preparing an investigation and

---

78. Mother's argument is made even more egregious by the fact that she filed a "Post–Trial Sur–Reply Brief" on July 9, 2012, and "Post–Trial Opening Brief" and "Post–Trial Reply Brief" on July 10, 2012, despite the fact the trial court set May 10 and June 7, 2007, as the dates for parties to file their post-trial briefs and reply briefs.

79. "[S]ection 211.447.2(2)(b) requires the juvenile officer to be joined as a party to any proceeding when the petition to terminate parental rights is filed by someone other than the juvenile officer." *C.M.B.R.*, 332 S.W.3d at 821.

social study. § 211.455.1 & .3. Section 211.455.3 directs the trial court to order that an investigation and social study be made by "the juvenile officer, the state division of family services, or a public or private agency authorized or licensed to care for children or any other competent person, as directed by the court...." Here, the trial court met with the juvenile officer in accordance with section 211.455.1 and determined proper service was issued on all parties. In addition, the trial court ordered Shannon Doyle, a care coordinator for children, to conduct an investigation and social study on Mother, complying with section 211.455.3. *See In re B.M.O.,* 310 S.W.3d 281, 288 (Mo.App.S.D.2010) (finding trial court did not abuse its discretion in ordering the division to undertake the statutorily required investigation and social summary).

The *C.M.B.R. decision* required simply that the juvenile officer "participate actively" in chapter 211 proceedings. Mother's argument attempts to place more requirements on the juvenile officer than those required by statute and by the Supreme Court. *See* § 211.401; § 211.455.1 & .3; *C.M.B.R.,* 332 S.W.3d at 821. For example, Mother argues the juvenile officer did not provide a case plan, or recommend or provide any services to Mother. However, "[t]he absence of treatment or services is no defense to a termination proceeding. Furthermore, a social service plan is not mandatory and its absence does not require reversal [in a termination of parental rights case]." *In re D.M.B.,* 178 S.W.3d 683, 688 (Mo.App.S.D. 2005) (internal citations omitted). If a social service plan is not mandatory, and the absence of services is not a defense, then the same cannot be a violation of due process under Missouri law.

Mother also attempts to make the juvenile officer's participation necessary for *her benefit,* rather than Child's best interest, by arguing she was denied due process because "the Juvenile Officer should have independently investigated whether the statutory requirements were satisfied for a private adoption ... [and] offered services to Mother." This argument misstates the reason the Supreme Court required the juvenile officer's participation: "Just as it is in [C]hild's best interest for the GAL to discharge his or her duties diligently, it also *is in [C]hild's best interest* for the juvenile officer to participate actively in chapter 211 proceedings." *C.M.B.R.,* 332 S.W.3d at 821 (emphasis added). Similar to a GAL, participation of the juvenile officer is not to advocate for or guard the interests of Mother; "therefore, Mother cannot be denied due process on the ground that [the juvenile officer] failed to represent her interests[ ]" by failing to speak with Mother or failing to offer her services.[80] *Id.* Thus, Mother's Point V is denied.

### Point VI—Mother's Claims She Was Denied Due Process Because She Did Not Have Counsel (Effective or Otherwise) for Ten Months

Mother raised arguments in Point VI, similar to her arguments in *C.M.B.R.* In *C.M.B.R.,* Mother argued she was not accountable for her delay in challenging the transfer-of-custody proceedings because of her initial lack of counsel, then ineffective counsel, and her failure to have notice of the transfer-of-custody hearing. 332 S.W.3d at 809. Mother raises all these arguments again in Point VI. However, the

---

80. Mother also argues the juvenile office failed to "undertake an investigation independent of [Adoptive Parents]." However, Mother fails to address this in her argument or provide any facts in support of this position.

Supreme Court's ruling on these very same arguments in *C.M.B.R.* is the law of case, and requires us to deny Mother's Point VI.

■■■ The law-of-the-case doctrine provides "that a previous holding in a case constitutes the law of the case and precludes relitigation of that issue on remand and subsequent appeal." *State v. Graham,* 13 S.W.3d 290, 293 (Mo. banc 2000) (quoting *Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 61 (Mo. banc 1999)). The doctrine governs successive adjudications involving the same issues and facts. *Shahan v. Shahan,* 988 S.W.2d 529, 533 (Mo. banc 1999). Generally, the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not. *Graham,* 13 S.W.3d at 293; *Shahan,* 988 S.W.2d at 533; *Walton v. City of Berkeley,* 223 S.W.3d 126, 128–29 (Mo. banc 2007).

The Supreme Court held Mother's claim of error regarding lack of counsel and notice, "as well as her other due process claims, are moot[ ]" because the court was reversing and remanding for a new trial on all issues. *C.M.B.R.,* 332 S.W.3d at 820. In addition, the record showed the summons served on Mother on October 16, 2007, gave her the required statutory notice that she had the right to request appointment of counsel, but she failed to make any request for counsel. *Id.* For both of these reasons, Mother's claims in Point VI are denied.

### *Point VII—Mother Claims Combining Termination Proceeding and Adoption Proceeding Violated Mother's Due Process*

■■■ Mother argues error in that "[Adoptive Parents] called witnesses to simultaneously testify 'about best interest grounds as well as statutory grounds for termination,' ... and exhibits were admitted (over objections) that mixed the issues of termination and adoption." However, Mother's counsel acknowledged *on the record in open court* that it is appropriate for a court to receive witness testimony about best interest along with witness testimony as to statutory grounds for termination:

[Mother's Counsel]: And the case law is very clear with any juvenile-in termination cases, that appellate courts recognize the trial judge's ability to filter out which evidence it's going to rely on[.]

While Mother acknowledges that combining termination and adoption proceedings in one trial is not error at trial, on appeal, Mother makes a different argument. Mother made this same argument in *C.M.B.R.* Again, the Supreme Court addressed this argument, and we adopt the Supreme Court's position as the law of the case:

Mother asserts that combining the TPR hearing and the adoption hearing into the same proceeding improperly injected evidence relevant to the adoption into the TPR hearing. TPR hearings under chapter 211 and adoption hearings under chapter 453 can proceed simultaneously before the same judge. *See State ex rel. Womack v. Rolf,* 173 S.W.3d 634, 639 (Mo. banc 2005); *see also Blackburn v. Mackey,* 131 S.W.3d 392, 396–98 (Mo.App.2004). The quality of the adoptive home is not a part of the termination inquiry; rather, the focus is on the natural parent's interactions and relationship with the child. *See* section 211.447; section 453.040(7). The issue of termination must be considered first in contested chapter 453 adoptions to avoid confusing the quality of the adoptive home with the grounds for terminating parental rights. *In re M.O.,* 70 S.W.3d 579, 588 (Mo.App.2002).

The trial court is presumed to know the law. *Lane v. Lensmeyer*, 158 S.W.3d 218, 224 (Mo. banc 2005). Moreover, "[t]he presumption is that the court, in weighing the evidence, was governed by correct rules of law." *Linders v. Linders*, 356 Mo. 852, 204 S.W.2d 229, 234 (1947); *see also Hodel v. Dir. of Revenue*, 61 S.W.3d 274, 280 (Mo.App. 2001) (stating that appellate courts "presume the trial court will sort out the incompetent and irrelevant and base its decision upon the competent and relevant evidence."). In this case, this Court presumes that the trial court considered and applied the evidence appropriately in first adjudicating termination of parental rights and then the adoption and will do so again on remand. *C.M.B.R.*, 332 S.W.3d at 821–22.

There is simply no evidence the trial court failed to consider and apply the evidence in first adjudicating the termination of parental rights and then the adoption.

Mother also alleges she objected to Exhibits 46, 47, 48 and 54, which were admitted, that mixed the issues of termination and adoption. However, after a review of the transcript, we find Exhibits 46, 47 and 48 were all admitted *without any objection* from Mother's counsel. Furthermore, Exhibit 54 was admitted by the trial court "for best interest only[.]" When asked whether Mother had an objection to Exhibit 54 being "received for best interest only," Mother's counsel replied, "Not from respondent, Your Honor." For Mother to state that these exhibits were admitted over her objection is untrue. Mother's Point VII is denied.

### Point VIII—Mother's Claim She Did Not Receive a "Fair and Neutral Hearing" Due to Considerations of Her Immigration Status

In this point, Mother alleges the trial court "improperly fixated on Mother's and her family member's immigration status" and she was denied due process because she did not receive a fair and neutral hearing since the trial court considered her immigration status. Mother further argues her "immigration status should not have been considered or used as a pretext to find that Child is supposedly better off with [Adoptive Parents]," and there was no evidence her immigration status would cause Child "'future harm.'"[81]

Mother made this exact same argument to the Supreme Court. There is no Missouri case expressly addressing how to handle immigration status of parents in termination cases, and the Supreme Court did not address this issue in *C.M.B.R.* However, in this case, there is no evidence that Mother's immigration status was a ground for termination of Mother's parental rights in and of itself, and there is no evidence the trial court based termination of her parental rights on her immigration status alone. With that being said, a trial court can consider a wide range of facts

---

**81.** Mother also makes the following claims of error not contained in her point relied on: trial court error in taking judicial notice of Mother's criminal case; trial court error in asserting that Mother continues to engage in "crimes" because she filed false tax returns; and trial court error in considering that Mother provides assistance to undocumented individuals. Arguments raised for the first time in the argument portion of a brief and not raised in the points relied on are not preserved for review and are considered abandoned. *Berger v. Huser*, 498 S.W.2d 536, 539 (Mo. banc 1973); *In re Marriage of Flud*, 926 S.W.2d 201, 206 (Mo.App.S.D.1996). Accordingly, we only consider Mother's claims of failure to receive a fair and neutral hearing due to considerations of her immigration status.

and evidence in reaching a conclusion.[82] Mother's immigration status was an unavoidable fact in evidence before the trial court by the very nature of the case. Mother was taken into custody due to her immigration status following a raid at her workplace. This set the wheels of this case in motion.

■ As a result of the raid, Mother was charged and pled guilty to aggravated identity theft, and was sentenced to two years' imprisonment. Similar to Missouri law regarding incarceration, *see In Interest of M.H.*, 828 S.W.2d 951, 955 (Mo.App. S.D.1992) (incarceration in and of itself is not grounds for termination of parental rights), Mother's immigration status and resulting imprisonment alone, is not a ground for termination. Nevertheless, her immigration status does not excuse her obligation to provide Child with a continuing relationship, nor does it excuse her obligation to make monetary contributions toward support of Child, even if the amount of those contributions might not significantly assist in providing Child with the essentials. *See In re N.L.M.*, 101 S.W.3d 376, 381 (Mo.App.S.D.2003) (holding incarceration does not excuse parent's obligation to continue the parent-child relationship and make monetary contributions toward support of child).

■ Furthermore, her immigration status properly played a part in reviewing Mother's past behavior, predicted future behavior, and possible future harm to Child. Any determination whether to terminate parental rights must include a consideration of whether the Child would be harmed by a continued relationship with a parent, with consideration of the present and looking to the future. *See K.A.W.*, 133 S.W.3d at 9–10. "Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* (footnote omitted).

The trial court, when considering whether Child would be harmed by a continued relationship with Mother, took note of her two illegal entries into the U.S., her multiple arrests related to those entries, and resulting imprisonment. Despite the fact her illegal entries caused separation from Child, Mother testified she plans to illegally re-enter the U.S. if deported, with full knowledge of the risks and consequences of incarceration, prosecution, deportation, and other legal and physical risks to herself and Child. The trial court noted parental unfitness may be determined by past and present actions, but in this case, Mother in essence "announce[d] . . . [her] intention to commit future crimes and put [Child] at risk of harm."

We simply can find no evidence Mother was denied due process due to her immi-

---

82. For example, section 211.447 provides for detailed consideration of the parent's past conduct, as well as the parent's conduct following the trial court's assumption of jurisdiction, as good evidence of future behavior. *In the Interest of M.E.W.*, 729 S.W.2d 194, 196 (Mo. banc 1987) (court needs to consider existing conditions which may have arisen or were discovered after it assumed jurisdiction); *C.L.W.*, 115 S.W.3d at 358 (court must look at totality of parent's conduct both prior to and after filing of termination petition); *In the Interest of S.H.*, 915 S.W.2d 399, 404–05 (Mo. App.W.D.1996) (past patterns provide vital clues to present and future conduct); *In re R.S.L.*, 241 S.W.3d 346, 353–56 (Mo.App.W.D. 2007) (court considered Mother's past and current mental condition and chemical dependency including, but not limited to, detailed evidence regarding when abuse started years prior to trial, her numerous hospitalizations, years of treatment, Mother's participation in therapy, years of counseling, drug test results over the years, and criminal history).

gration status. More importantly, there is no evidence the trial court based termination of her parental rights on her immigration status. Mother's Point VIII is denied.

Accordingly, we find Mother's due process rights were not violated; all allegations contained in Part Three are denied.

### "Part One": Mother's Alleged Err Due to Failures to Comply With Statutes (Mother's Points I, II and III)

Finally, we review Part One. In Part One, Mother alleges the termination and adoption proceeding failed to strictly and literally comply with various governing statutes, and because of these failures to comply, the Judgment should be reversed. The Supreme Court addressed and resolved Mother's allegations of error regarding alleged failures to comply with statutes, which is now the law of the case.[83] *C.M.B.R.*, 332 S.W.3d at 806–13. *See also Graham*, 13 S.W.3d at 293.

#### Point I—Mother's Claim of Failure to Comply With Placement Statute

Mother's first alleged failure to comply involves section 453.014.1(4), which specifies those individuals or entities who may place children for adoption to include "an attorney licensed pursuant to chapter 484; a physician licensed pursuant to chapter 334; or a clergyman of the parents." § 453.014.1(4). Mother argues there is no evidence the Velazcos are clergymen, much less Mother's clergymen, and there-

fore, the Velazcos were not authorized to place Child with Adoptive Parents. Mother's argument appears to be that because Child was not "legally placed for a private adoption" due to failure to strictly comply with the placement statute, Child was not eligible for adoption and, therefore, the Judgment should be reversed.

Mother raised this issue in her previous appeal and the Supreme Court found Mother did not timely protest the alleged improper proceedings and transfer of custody[84] and, therefore, her claim of error was not preserved and could only be reviewed for plain error. *C.M.B.R.*, 332 S.W.3d at 808. The untimeliness of Mother's protest is not changed in this appeal. Under Rule 84.13(c) plain-error review, the Supreme Court found *"Mother has failed to prove a miscarriage of justice or manifest injustice."* *Id.* at 810 (emphasis added). The Supreme Court clearly disagreed that this error resulted in manifest injustice to Mother, and further found any "prejudice to Mother was exacerbated by the lateness of her claims." *Id.*

Furthermore, the Supreme Court found Mother's claim of error of failure to comply with the placement statute "would not result in dismissal of the petition, but would, instead, require rehearing of the transfer of custody matter, which is not in Child's best interest at this point in the proceeding." *Id.* This holding indicates that an alleged error of failure to comply with the placement statute would require rehearing of the transfer of custody hear-

---

**83.** Following remand in *C.M.B.R.*, Adoptive Parents filed their Amended Petition, petitioning for termination of parental rights and *adoption under chapters 453 and 211.* The Supreme Court extensively explored the purposes and differences between chapters 211 and 453, along with the construction of these chapters, in *C.M.B.R.*, 332 S.W.3d at 806–08; we need not duplicate what the Supreme Court has already done.

**84.** The placement of Child with Adoptive Parents took place in October 2007; Mother first objected to the alleged improper placement approximately two years later on appeal after entry of the Judgment terminating her parental rights and granting adoption of Child by Adoptive Parents. *C.M.B.R.*, 332 S.W.3d at 808.

ing, and *not* reversal or dismissal of the termination and adoption petition, and a rehearing on the transfer of custody will be granted if it is shown to be in "Child's best interest at this point in the proceeding." *Id.*

■ The Supreme Court's findings on Mother's claims of error are the law of the case; the law-of-the-case doctrine "governs successive adjudications involving the same issues and facts." *C.M.B.R.,* 332 S.W.3d at 823. Under this theory, the Supreme Court's finding of no plain error because there was no miscarriage of justice or manifest injustice is binding on this Court and precludes relitigation of this issue on appeal. *Shahan,* 988 S.W.2d at 533. If we were to find otherwise, it would be in direct contradiction to the Supreme Court's finding in *C.M.B.R.*

Likewise, if we were to adopt Mother's position, we would have to find that because there was no "legal" placement of Child with Adoptive Parents, there could never be a valid adoption by Adoptive Parents. The Supreme Court had an opportunity to make such a finding in *C.M.B.R.,* as Mother's very same argument was presented to the Supreme Court, but declined to do so as evidenced by the ruling to remand the case "for a new trial in which Adoptive Parents and Mother [would] have the opportunity to present evidence on all claims in all counts of the petition that pertain to Mother." *C.M.B.R.,* 332 S.W.3d at 823–24.

In anticipating the law-of-the-case doctrine argument, Mother argues "the so-called 'law[-]of[-]the[-]case' doctrine" does not excuse the placement of Child with Adoptive Parents because the record before this Court is very different from the record before the Supreme Court. Mother argues there was no evidence of the urgent need of medical care for Child, or that Child was in need of food, clothing or

shelter and, therefore, the Velazcos should have allowed Child to remain with Mother's family or contacted social services. However, none of these arguments relate to whether or not the Velazcos qualified as individuals who may place a minor for adoption under section 453.014.1.

Furthermore, as we previously noted, the record before this Court is much larger than the record before the Supreme Court. We disagree with Mother's position that this larger record does not include evidence there was an urgent need of placement of Child. In fact, the record is quite the opposite as discussed earlier in this opinion. Mother's Point I is denied.

### Point II—Mother's Claim of Failure to Comply With Mandated Requirements for Investigations, Assessments, Written Reports and Recommendations

Mother's next allegation is the trial court failed to strictly and literally comply with the statutorily mandated requirements for a written report from placement provider, pursuant to section 453.026; an investigation report, pursuant to section 453.070; a post-placement assessment, pursuant to section 453.077; and a post-placement assessment of person placing child, pursuant to section 453.080.

■ "[A] party aggrieved by non-compliance with statutes and rules still must timely raise the error." *C.M.B.R.,* 332 S.W.3d at 808. The Supreme Court already found Mother did not timely protest the lack of investigation and filing of reports. *Id.* This finding is the law of the case. With respect to the failure to comply with section 453.026, the Supreme Court found the failure did not result in a miscarriage of justice or manifest injustice and, therefore, no relief for such error relating to section 453.026 under plain-

error review was warranted. *Id.* at 810. This is the law of the case in this matter.

 With respect to sections 453.070 and 453.077, the Supreme Court remanded the case and ordered the investigation and reports required, pursuant to these two statutes, be made prior to trial. *Id.* at 824. As Mother acknowledged in her brief, Adoptive Parents submitted a report that satisfies section 453.070, and was reviewed by the trial court. Since the report was made and presented to the trial court, there is no failure to comply with section 453.070.[85]

As to sections 453.077 and 453.080, Mother's complaint is the assessments were provided by the wrong individuals. Specifically, her argument is these sections require post-placement assessments from the *placement providers,* and none were provided by the Velazcos. Section 453.077.1 provides "the person conducting the preplacement assessment of the adoption *or other persons authorized to conduct assessments pursuant to section 453.070* shall provide the court with a postplacement assessment." (Emphasis added). Section 453.070.2 specifically provides "investigation[s] shall be made, as directed by the court having jurisdiction, either by the division of family services ... a juvenile court officer, ... or *other suitable person appointed by the court.*" (Emphasis added).

 Here, the trial court specifically ordered that attorney Angela Vorhees ("Vorhees") conduct "any necessary Post Placement Assessments pursuant to R.S.Mo. §§ 453.070 and 453.077." Therefore, Vorhees was a person "authorized to conduct assessments pursuant to section 453.070" in that she was appointed by the trial court. §§ 453.070.2 and 453.077.1. No objection was raised by Mother in response to the trial court's order that attorney Vorhees prepare any necessary postplacement assessments, nor does Mother now cite any authority indicating that attorney Vorhees was not a "suitable person" to be appointed by the court to conduct the investigation.

 Similarly, when the post-placement assessment was offered to the trial court, Mother's attorney said, "[n]o objection" to the post-placement assessment prepared by attorney Vorhees. Mother was clearly aware the assessment was prepared by attorney Vorhees and not the Velazcos.[86] "The general rule in Missouri

---

85. Despite her concession, Mother argues the report fails to address issues raised in a prior home study and, therefore, the report was not completed as required. This argument warrants comment for two reasons. First, Mother failed to include the alleged erroneous report in the record on appeal, leaving nothing for this Court to review. When an exhibit is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant. *C.A.M.*, 282 S.W.3d at 401.

Second, Mother misconstrues the purpose of the investigative report. "Its purpose is to *apprise* the court of the circumstances of the parties to an adoption proceeding with respect to the best interests of the child whose adoption is sought. It does not *adjudicate* the issues presented. That is the function of the court. The report is a tool provided the trial court." *In re K.K.J.,* 984 S.W.2d 548, 554 (Mo.App.S.D.1999) (internal citations omitted) (emphasis in original).

86. Mother's attorney objected when the assessment was originally offered because it included a recommendation that the trial court terminate the parental rights of Mother. Mother argued that was not the purpose of the assessment, and the trial court acknowledged this by noting it "never read[s] those until I've made a determination." Adoptive Parents later presented an amended assessment to remove the objectionable recommendation.

is that a statement of 'no objection' when the evidence is introduced affirmatively waives appellate review of the admission." *State v. Oglesby*, 103 S.W.3d 890, 891 (Mo. App.E.D.2003).

Accordingly, there was no plain error in failure to comply with section 453.026, and no failure to strictly comply with sections 453.070, 453.077, and 453.080 as alleged by Mother. Mother's Point II is denied.

### Point III—Mother's Claim of Failure Regarding Transfer Court Order Notice to Mother, Counsel Appointment and Services Provided to Mother

 Mother's first allegation of error in Point III is that the trial court failed to strictly comply with section 453.110.1 because Adoptive Parents took custody of Child before a court order. Mother also raised this argument in her previous appeal and the Supreme Court's finding on this argument is the law of the case. While the Supreme Court found custody of Child "was surrendered and taken before a court order in violation of section 453.110.1[,] ... Mother has failed to show a manifest injustice or a miscarriage of

justice occurred." *C.M.B.R.*, 332 S.W.3d at 809.

Despite the Supreme Court's *clear* finding that Mother read the case *In re Baby Girl*, 850 S.W.2d 64 (Mo. banc 1993) "too broadly," Mother again cites *In re Baby Girl* in this appeal in support of her argument that the "transfer of custody of [Child] from [the Velazcos] to [Adoptive Parents] ... was 'illegal from its inception.'" *C.M.B.R.*, 332 S.W.3d at 808. The Supreme Court contrasted the facts of *In re Baby Girl* with the facts of this case,[87] and found "[t]he proceedings and resulting court order for transfer of custody, even if defective, are not void." *Id.*

After a review of the facts, the Supreme Court found Mother failed to show manifest injustice or a miscarriage of justice occurred due to transfer of custody without a court order. *Id.* Furthermore, the Supreme Court determined any error in the failure to comply with section 453.110 would require rehearing of the transfer of custody matter, which the court determined "[was] not in Child's best interest at this point in the proceeding." *Id.* at 810. In accordance with the law of the case, we reject Mother's argument that all acts after transfer of custody were void.[88]

---

87. The Supreme Court contrasted the facts of *In re Baby Girl* with this case as follows:

In [*In re Baby Girl*], this Court found the transfer of custody from birth mother to prospective adoptive parents "illegal from its inception" because the prospective adoptive parents took custody of the child from the hospital where she was born and transported the child to their home state of Arkansas without any person seeking and obtaining judicial approval of the transfer of custody. The Court found that this was "precisely the type of action that the legislature sought to avoid when it enacted [section] 453.110.1."

In contrast, in this case, Adoptive Parents filed their petition for transfer of custody in the circuit court sitting as a juvenile division of the county in which Child was located, and that court entered an order trans-

ferring custody of Child to them pursuant to section 453.110.1. Mother challenges the proceedings and resulting order transferring custody because there were deficiencies in those proceedings. She does not claim that no judicial action was filed or that there was no order transferring custody.

*C.M.B.R.*, 332 S.W.3d at 808 (internal citations omitted).

88. Mother argues multiple times in her brief that various issues regarding the original transfer of custody already decided by the Supreme Court should be reviewed again because the Supreme Court ordered the case remanded for a new trial on "all issues pertaining to Mother." This is an improper reading of the Supreme Court's opinion for several reasons. First, the cause was re-

■ Likewise, the Supreme Court resolved Mother's second allegation of error in Point III, which is that Mother was not given five days' notice of hearing as required by Rule 44.01(d). The Supreme Court found Mother did not timely protest, and there was no plain error in the failure to comply with Rule 44.01(d). *C.M.B.R.*, 332 S.W.3d at 808–10. The Supreme Court's findings are the law of the case.

Mother's third allegation of error in Point III is that counsel was not appointed for Mother prior to the transfer hearing. Again, this issue was addressed and resolved by the Supreme Court, first noting Mother never requested counsel. *Id.* Although she had a statutory right to counsel under chapters 211 and 453, Mother had to *assert* that statutory right. *Id.* The summons notified Mother of her right to request appointment of counsel, but she failed to request counsel.[89] *Id.* at 810.

The Supreme Court in *C.M.B.R.*, found the record refuted Mother's claims she was not served the Petition and could not assert her rights. *Id.* at 810. Upon retrial of the matter, the trial court also found Mother's claim she had not received the Petition was clearly discredited because Mother had in fact been served with a copy of the Petition. The administrator for the St. Clair County Sheriff's Department testified the original Petition was found in Mother's jail cell after she was transferred to federal prison, along with other materials belonging to Mother.

In addition, the civil summons was admitted into evidence and showed delivery of the summons and Petition to Mother on October 16, 2007. The summons also notified Mother she had "the right to have an attorney present to assist you at all juvenile court hearings, or you may waive your right to an attorney if you desire to."

Finally, any "prejudice to Mother was exacerbated by the lateness of her claims." *Id.* The Supreme Court's findings on Mother's alleged error that counsel was not appointed for Mother prior to the transfer hearing is the law of the case.

■ Mother's fourth allegation in Point III claims error in the trial court's finding that there is little likelihood that additional services would be likely to bring about a lasting parental adjustment. This allegation of error contained with the other claims of error in Point III is evidence of the multifarious nature of Point III as it is not related to the other allegations of error. "Multiple contentions not related to a single issue may not be grouped together in a single point relied on." *In re S.L.N.*, 8 S.W.3d 916, 921 (Mo.App.S.D.2000). In addition, Mother failed to fully develop her argument and explain why, in the context of her case, the law supports the claim of error, and failed to cite to the transcript or legal file for the facts supporting her argument. *See Washington v. Zinn*, 286 S.W.3d 828, 831 (Mo.App.E.D.2009) (finding the argument portion contained inaccu-

---

manded for new trial on all issues regarding Mother "contained within the petition." *Id.* at 819. Transfer of custody is not an issue raised in the Petition or Amended Petition. Second, the Judgment was reversed for failure to comply with statutes mandating investigation and reporting; not allegations of statutory errors regarding transfer of custody raised by Mother in *C.M.B.R.* Third, the Supreme Court specifically found errors for failure to comply with statutes regarding placement and transfer of custody did not amount

to a miscarriage of justice or manifest injustice. *Id.* at 810.

89. Despite her failure to request appointment of counsel, the trial court appointed counsel for Mother on two occasions. On December 3, 2007, attorney James Calton was appointed. The notice to Mother of court appointment was returned "refused." Attorney Dominguez, fluent in Spanish, was appointed counsel for Mother on June 13, 2008.

rate citations to the transcript and included statements of "fact" supported only by appellant's allegations in his petition). Mother never explained how the trial court's findings regarding services entitled her to reversal, nor did she provide legal authority supporting a conclusion that the trial court's finding on services entitles her to a reversal.

We cannot discern Mother's fourth argument in Point III, and therefore, we decline to address Mother's fourth allegation of error in Point III. *See Atkins v. McPhetridge,* 213 S.W.3d 116, 120–21 (Mo.App. S.D.2006). Mother's Point III is denied.

Accordingly, we find no error as alleged in Part One by Mother regarding statutorily mandated requirements.

### CONCLUSION

The trial court's Judgment is affirmed.

GARY W. LYNCH, P.J. and NANCY STEFFEN RAHMEYER, J., CONCUR.